John Mansfield
Mansfield Law
121 SW Morrison, Suite 400
Portland, OR 97204
(971) 271-8615
john@mansfieldlaw.net

Jonathan T. Suder (pro hac vice to be filed)
Brett M. Pinkus (pro hac vice to be filed)
Glenn S. Orman (pro hac vice to be filed)
FRIEDMAN, SUDER & COOKE
604 E. Fourth Street, Suite 200
Fort Worth, TX 76102
(817) 334-0400
(817) 334-0401 fax
jts@fsclaw.com
pinkus@fsclaw.com
orman@fsclaw.com

ATTORNEYS FOR PLAINTIFF
ADASA INC.

**IN THE UNITED STATES DISTRICT COURT**

**DISTRICT OF OREGON**

**EUGENE DIVISION**

| | |
|---|---|
| **ADASA INC.**, an Oregon corporation<br><br>Plaintiff,<br><br>v.<br><br>**ALIEN TECHNOLOGY LLC.**, a Delaware corporation,<br><br>Defendant | Case No.: 6:16-cv-954<br><br>**COMPLAINT FOR PATENT INFRINGEMENT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff ADASA INC. ("Plaintiff" or "ADASA") files this Original Complaint against Defendant ALIEN TECHNOLOGY LLC, alleging as follows:

## I. THE PARTIES

1. ADASA INC. is a corporation organized and existing under the laws of the State of Oregon, with a principal place of business in Eugene, Oregon.

2. Upon information and belief, Defendant ALIEN TECHNOLOGY LLC ("ALIEN" or "Defendant") is a corporation organized and existing under the laws of the State of Delaware, with a principal place of business in Seattle, WA. ALIEN may be served with process through its registered agent, Incorporating Services, Ltd., 720 14th Street, Sacramento, CA 95814.

## II. JURISDICTION AND VENUE

3. ADASA's claims for patent infringement against ALIEN arise under the patent laws of the United States, including 35 U.S.C. §§ 271(a) and (b). Consequently, this Court has exclusive jurisdiction of such action under Title 28 U.S.C. § 1331 and 1338.

4. ALIEN is subject to both the specific and general personal jurisdiction of this Court because, among other things, it has established continuous and systematic contacts in this judicial district, including by conducting business throughout the State of Oregon; it has committed acts of patent infringement within this judicial district giving rise to this action; and it has minimum contacts with the forum such that the exercise of jurisdiction over it would not offend traditional notions of fair play and substantial justice. For all of these reasons, personal jurisdiction exists and venue is proper in this Court under 28 U.S.C. §§ 1391(b)(1), (2) and (c)(2) and 28 U.S.C. § 1400(b).


MANSFIELDLAW
121 SW Morrison, Ste. 400
Portland OR 97204

## PATENT-IN-SUIT

5. On March 1, 2016, U.S. Patent No. 9,272,805 B2 ("the '805 Patent") was duly and legally issued for "SYSTEMS, METHODS, AND DEVICES FOR COMMISSIONING WIRELESS SENSORS." A true and correct copy of the '805 patent is attached hereto as Exhibit A.

6. The '805 Patent, very generally speaking, relates to encoded wireless radio frequency identification ("RFID") devices. More specifically, the '805 Patent claims an RFID transponder or integrated circuit with a specific memory structure that utilizes the "most significant bits" of a block of the memory in order to create a unique serial number for an associated individual item.

## BACKGROUND

7. Clarke McAllister, the President and Founder of Plaintiff, has worked with and in the RFID industry since the early 1990s, including founding his own RFID company, ADASA Incorporated, in 2004.

8. At the time McAllister founded ADASA, the RFID industry was challenging the then-predominant method of using individual bar codes to keep track of merchandise. Instead, the industry began experimenting with RFID solutions that used encoding networks developed either through Wi-Fi connected internet, or, in the case of larger companies, their own dedicated in-house network. With this burgeoning technology came early development hiccups, including weak Wi-Fi signals, inaccurate tracking, and insufficient battery life on the new RFID tag encoding devices.

9. In early 2008, McAllister set out to improve the existing technology in the RFID tag and encoding industry by creating a tangible device that could be used with real-time RFID


MANSFIELDLAW
121 SW Morrison, Ste. 400
Portland OR 97204

encoding (without having to rely on spotty Wi-Fi or in-house Ethernet networks) and that still produced a unique item number. McAllister reconfigured the structure of the memory in an RFID integrated circuit to take into account a small number of digital bits – ultimately known in the '805 Patent as the "most significant bits" – that would identify key pieces of information and streamline a customer's ability to produce unique product numbers in real time or to be pre-encoded before application to a commercial product. These "most significant bits" – as described in the '805 Patent – help define an important section of the memory of a 96- or 128-bit encoded RFID integrated circuit, which allows customers, for instance, to identify where the integrated circuit chip serial number came from (i.e. what entity or company encoded it).

10. In the years after McAllister originally filed for patent protection for his inventions, the industry began implementing McAllister's idea in wide-spread fashion and without any attribution. Specifically, several industry manufacturers banded together to create what became known as the "multi-vendor chip-based serialization" agreement ("MCS"). This agreement is, in effect, a new guideline for the industry that focuses on a 38-bit portion of the code within an encoded RFID device and, within the memory structure of such a device, uses "most significant bits" to help create a unique product identifier. These "most significant bits" are often called the "MCS prefix" or "MCS allocation" bits by ALIEN and other chip manufacturers in this industry. This adopted proposal mirrored the solution McAllister and ADASA had pioneered years earlier. Today, many companies in the RFID encoding industry, including ALIEN, regularly use and market their ability to encode RFID tags using the "MCS" guideline to their customers.


MANSFIELDLAW
121 SW Morrison, Ste. 400
Portland OR 97204

**FIRST CLAIM FOR RELIEF**
**(Patent Infringement)**

11. Plaintiff incorporates by reference Paragraphs 1 - 10 of this Complaint as if set forth below.

12. Plaintiff is the owner of the ‘805 Patent with the exclusive right to enforce the ‘805 Patent against infringers, and collect damages for all relevant times, including the right to prosecute this action.

13. ALIEN directly infringes the ‘805 Patent because it makes, uses, sells, and offers for sale RFID integrated circuits pre-encoded with an MCS encoded structure, particularly including using the most-significant bits identified in the ’805 Patent. By way of example only, ALIEN, at a minimum, directly infringes at least claims 16 and 17 of the ‘805 Patent by making, selling, and offering to sell MONZA 6 integrated circuits that are pre-encoded with a unique serial number using the MCS encoded structure.

14. More particularly, ALIEN makes, sells, and offers to sell integrated circuit chips in which the memory is formatted into blocks that are at least partially encoded using the MCS encoding structure. ALIEN internally formats the memory of the chip to include an Electronic Product Code (“EPC”) memory bank with at least 96 total bits of information. The EPC memory bank includes a unique object number space having a block for an object class information space (i.e. the UPC or SKU portion of a code) and a separate block of at least 38 bits for a unique serial number space that can identify a specific item. Within the unique serial number space block allocated within the chip, ALIEN encodes the three “most significant bits,” as identified in the ‘805 Patent, with its own code of “101” to identify ALIEN as the manufacturer of the chip and


MANSFIELDLAW
121 SW Morrison, Ste. 400
Portland OR 97204

then encodes the remaining bits with a serial number. This results in the chip being pre-encoded by ALIEN with a unique serial number within the unique serial number space block.

15. ALIEN's use of this technology is not kept confidentially. To the contrary, ALIEN advertises, promotes, and describes in a step-by-step fashion how it internally encodes or instructs others to encode its chips using MCS and as described by the '805 patent. Specifically, on its website, ALIEN offers to the public several documents, which describe with great detail how ALIEN encodes its own chips and instructs others to encode its chips using MCS and mirrors the very chip described in claim 16 of the '805 Patent. While ALIEN describes its MCS encoded chips in several different marketing materials, the example sets of instructions and materials provided in Exhibits B, C, and D to this complaint offer a direct example of the company's use of the technology described in ADASA's '805 Patent.

16. Additionally, ALIEN indirectly infringes the '805 Patent because it makes, uses, sells, and offers for sale encoded RFID integrated circuits that use the MCS encoded structure. By way of example only, ALIEN, at a minimum, induces infringement at least claims 16 and 17 of the '805 Patent by making, selling, and offering to sell MONZA 4, 5, and 6 integrated circuits with a formatted memory structure for which the encoding of the unique serial number is to be completed by brand owners, retailers, service bureaus, inlay providers, and/or other end users using the MCS encoding structure. For example, customers and users of the accused products (such as Perry Ellis, Fossil, Hanes, Tagsys, SML Group, SMARTRAC) directly infringe at least claim 16 and 17 of the '805 Patent when using or employing ALIEN's described MCS encoding structure. ALIEN customers and users ultimately directly infringe the '805 Patent by purchasing an integrated circuit from ALIEN that is formatted with a portion of the MCS structure


MANSFIELDLAW
121 SW Morrison, Ste. 400
Portland OR 97204

embedded in it and then finish encoding the remaining bits according to ALIEN's instructions using MCS.

17. On information and belief, ALIEN possesses a specific intent to induce infringement by at a minimum, providing formulas, programming code, firmware, software, instructions, user guides, industry white-papers, and other sales-related materials that instruct its customers and users on the operation of the accused products and the steps to encode the MONZA 4, 5, and 6 integrated circuits that infringe the '805 Patent. Such materials include the examples previously mentioned and attached as Exhibits B, C and D.

18. By providing formulas, programming code, firmware, software, instructions, user guides, industry white-papers, and other sales-related materials regarding encoding its accused integrated circuit chips using the MCS structure, on information and belief, ALIEN knows that its acts will induce its end customers to infringe at least claims 16 and 17 of the '805 Patent.

19. ADASA has been damaged as a result of ALIEN's infringing conduct. ALIEN is, thus, liable to ADASA in an amount that adequately compensates ADASA for ALIEN's infringement, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

20. ALIEN has knowledge of the '805 Patent at least as early as the service of this complaint.

## PRAYER FOR RELIEF

ADASA requests that the Court find in its favor and against ALIEN, and that the Court grant ADASA the following relief:

a. Judgment that one or more claims of the '805 Patent have been infringed, either literally and/or under the doctrine of equivalents, by ALIEN;


MANSFIELDLAW
121 SW Morrison, Ste. 400
Portland OR 97204

b. Judgment that ALIEN account for and pay to ADASA all damages to and costs incurred by ADASA because of ALIEN's infringing activities and other conduct complained of herein;

c. That ALIEN, its officers, agents, servants and employees, and those persons in active concert and participation with any of them, be permanently enjoined from infringement of the '805 Patent. In the alternative, if the Court finds that an injunction is not warranted, ADASA requests an award of post judgment royalty to compensate for future infringement;

d. That ADASA be granted pre-judgment and post-judgment interest on the damages caused to it by reason of ALIEN's infringing activities and other conduct complained of herein;

e. That this Court declare this an exceptional case and award ADASA its reasonable attorney's fees and costs in accordance with 35 U.S.C. § 285; and

f. That ADASA be granted such other and further relief as the Court may deem just and proper under the circumstances.

## JURY DEMAND

Plaintiff hereby requests a trial by jury pursuant to Rule 38 of the Federal Rules of Civil Procedure.

DATED: May 31, 2016.

/s/ John Mansfield
Mansfield Law
121 SW Morrison, Suite 400
Portland, OR 97204
(971) 271-8615
john@mansfieldlaw.net

Jonathan T. Suder (pro hac vice to be filed)
Brett M. Pinkus (pro hac vice to be filed)

Glenn S. Orman (pro hac vice to be filed)
FRIEDMAN, SUDER & COOKE
604 E. Fourth Street, Suite 200
Fort Worth, TX 76102
(817) 334-0400
(817) 334-0401 fax
jts@fsclaw.com
pinkus@fsclaw.com
orman@fsclaw.com

ATTORNEYS FOR PLAINTIFF
ADASA INC.

EXHIBIT A

US009272805B2

(12) **United States Patent**
**McAllister**

(10) **Patent No.: US 9,272,805 B2**
(45) **Date of Patent: Mar. 1, 2016**

(54) **SYSTEMS, METHODS, AND DEVICES FOR COMMISSIONING WIRELESS SENSORS**

(75) Inventor: **Clarke William McAllister**, Eugene, OR (US)

(73) Assignee: **ADASA INC.**, Eugene, OR (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 98 days.

(21) Appl. No.: **13/526,520**

(22) Filed: **Jun. 19, 2012**

(65) **Prior Publication Data**

US 2012/0256732 A1 Oct. 11, 2012

**Related U.S. Application Data**

(63) Continuation-in-part of application No. 12/820,109, filed on Jun. 21, 2010, now Pat. No. 8,228,198, which is a continuation-in-part of application No. 11/465,712, filed on Aug. 18, 2006, now Pat. No. 7,830,258, said application No. 12/820,109 is a continuation-in-part of application No. 12/124,768, filed on May 21, 2008, now abandoned.

(60) Provisional application No. 60/709,713, filed on Aug. 19, 2005, provisional application No. 60/939,603, filed on May 22, 2007.

(51) **Int. Cl.**

| | |
|---|---|
| ***H04Q 5/22*** | (2006.01) |
| ***B65C 9/18*** | (2006.01) |
| ***B65C 11/00*** | (2006.01) |
| ***G06K 19/077*** | (2006.01) |
| *B65C 9/00* | (2006.01) |
| *B65C 9/40* | (2006.01) |
| *G06K 17/00* | (2006.01) |

(52) **U.S. Cl.**
CPC ............ ***B65C 9/1865*** (2013.01); ***B65C 11/006*** (2013.01); ***G06K 19/077*** (2013.01); ***G06K 19/07716*** (2013.01); *B65C 2009/0003* (2013.01); *B65C 2009/404* (2013.01); *G06K 2017/0041* (2013.01)

(58) **Field of Classification Search**
CPC .............. G06K 2017/0045; G06K 2017/0051; G06K 19/077; G06K 19/07716; B65C 9/1865; B65C 11/006
USPC .......... 340/572.1–572.9, 10.1–10.6; 709/217; 705/28
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,227,617 | A | 7/1993 | Christopher |
| 5,280,159 | A | 1/1994 | Schultz |
| 5,382,784 | A | 1/1995 | Eberhardt |
| 5,763,867 | A | 6/1998 | Main |
| 5,825,045 | A | 10/1998 | Koenck |
| 5,850,187 | A | 12/1998 | Carrender |
| 5,962,837 | A | 10/1999 | Main |
| 6,078,251 | A | 6/2000 | Landt |
| 6,130,613 | A | 10/2000 | Eberhardt |
| 6,195,053 | B1 | 2/2001 | Kodukula |
| 6,246,326 | B1 | 6/2001 | Wiklof |
| 6,279,638 | B1 | 8/2001 | Goodwin |

(Continued)

*Primary Examiner* — Thomas Mullen
(74) *Attorney, Agent, or Firm* — Fay Kaplun & Marcin, LLP

(57) **ABSTRACT**

In one embodiment the present invention comprises a smartphone and encoders for commissioning RFID transponders. The present invention further includes novel systems, devices, and methods for commissioning RFID transponders with unique object class instance numbers without requiring a realtime connection to a serialization database.

**20 Claims, 19 Drawing Sheets**



(56) **References Cited**

U.S. PATENT DOCUMENTS


| | | | | |
|---|---|---|---|---|
| 6,280,544 | B1 | 8/2001 | Fox | |
| 6,332,098 | B2 | 12/2001 | Ross | |
| 6,357,662 | B1 | 3/2002 | Helton | |
| 6,379,058 | B1 | 4/2002 | Petteruti | |
| 6,409,401 | B1 | 6/2002 | Petteruti | |
| 6,415,978 | B1 | 7/2002 | McAllister | |
| 6,478,229 | B1 | 11/2002 | Epstein | |
| 6,481,907 | B2 | 11/2002 | Banach | |
| 6,486,780 | B1 | 11/2002 | Garber | |
| 6,532,346 | B2 | 3/2003 | Gallivan | |
| 6,677,852 | B1 | 1/2004 | Landt | |
| 6,805,183 | B2 | 10/2004 | Goodwin | |
| 6,830,181 | B1 | 12/2004 | Bennett | |
| 6,848,616 | B2 | 2/2005 | Tsirline | |
| 6,857,714 | B2 | 2/2005 | Hohberger | |
| 6,884,312 | B2 | 4/2005 | Mitchell | |
| 6,899,476 | B1 | 5/2005 | Barrus | |
| 6,963,351 | B2 | 11/2005 | Squires | |
| 7,066,667 | B2 | 6/2006 | Chapman | |
| 7,069,251 | B1 | 6/2006 | Bartz | |
| 7,073,712 | B2 | 7/2006 | Jusas | |
| 7,075,435 | B2 | 7/2006 | Jesser | |
| 7,114,655 | B2 | 10/2006 | Chapman | |
| 7,187,294 | B2 | 3/2007 | Burdette | |
| 7,223,030 | B2 | 5/2007 | Fessler | |
| 7,249,819 | B2 | 7/2007 | Burdette | |
| 7,320,432 | B2 | 1/2008 | Sureaud | |
| 7,421,367 | B2 | 9/2008 | Nye | |
| 7,551,087 | B2 | 6/2009 | McAllister | |
| 7,664,257 | B2 | 2/2010 | Hohberger | |
| 2002/0005774 | A1 | 1/2002 | Rudolph | |
| 2002/0059880 | A1 | 5/2002 | Klinefelter | |
| 2003/0227528 | A1 | 12/2003 | Hohberger | |
| 2004/0046644 | A1 * | 3/2004 | Bauhahn | 340/10.42 |
| 2004/0074964 | A1 | 4/2004 | Falkenrich-wesche | |
| 2004/0124235 | A1 | 7/2004 | White | |
| 2004/0141790 | A1 | 7/2004 | Waters | |
| 2005/0007238 | A1 * | 1/2005 | Hartmann et al. | 340/10.2 |
| 2005/0045724 | A1 | 3/2005 | Tsirline | |
| 2005/0218219 | A1 | 10/2005 | Sano | |
| 2005/0280537 | A1 | 12/2005 | Feltz | |
| 2005/0283272 | A1 | 12/2005 | Roberts | |
| 2006/0080819 | A1 | 4/2006 | McAllister | |
| 2007/0103314 | A1 * | 5/2007 | Geissler | 340/572.8 |
| 2007/0150219 | A1 | 6/2007 | Cawker | |


* cited by examiner


10
20
11
Host or network computer
Database
Remote computer
13
30
Optical Reader
Encoder
Transponder commissioning means
Communication means
Supply of transponders
15
Entities with visual external label (e.g. bar code) – optically read label
Object needing identification
17
50

FIG. 1




FIG. 2




FIG. 3




FIG. 4




FIG 5


30
Mobile Applicator
36
External antenna
61
On-board computer with Wi-Fi
63
RFID Interrogator Module
62
Internal antenna to program (commission) and verify transponders
Operator output devices (Indicator LEDs)
37
38
39
60
On-board power source (battery)
70
Electro-mechanical interface components
44
42
Take-up reel (Take-up roll)
Supply reel (Supply roll)
43
Cartridge

FIG. 6




FIG. 7


64
61
On-board computer
63
Interrogator module
Contact image sensor
90
62
Drive motor
32
42
Source reel
76
43
Power source
Take-up reel
Power source
60
44
Cartridge
86
66

FIG. 8




Fig. 9



219
210
219b
219a
218
216c
216b
86
66
216a
215c
216f
46
212c
216d
217d
212a
212b
217e
42
43
44
211a
211b
63
76
60
213b


FIG. 10



111
Position Smartphone and capture image
112
Decode
113
Compute Transponder Payload
114
Encode Transponder


Fig. 11



121
Identify container to be tagged
122
Identify information to be encoded on RFID transponder
123
Commission RFID transponder
124
Tag container with commissioned RFID transponder


Fig. 12


131
Advance RFID transponders
133
Test RFID transponder
Good
Bad
132
Prepare to commission RFID transponder
135
Maintain tag on liner and advance to take-up reel
Fail
134
Verify encoding
Notify Fail or Bad condition
137
Pass
Remove liner and dispense transponder
136
Apply transponder to container
138

Fig. 13


140
Serial Number Database
141
Table GTIN A
141a
141b
141c
Start 10
Remaining
Start 11
Remaining
Start 12
Remaining
142
Table GTIN B
Start 12
Remaining
Start 14
Remaining
Start 16
Remaining
143
Table GTIN C
Start 35
Remaining
Start 36
Remaining
Start 37
Remaining
144
9
Block 0
0
145
11
Block 1
0
146
35
Block 2
0

Fig. 14


151
152
SQL Database
153
Script
154
Smartphone
155
RFID Encoder
156
RFID Transponder

FIG. 15


161
Biometric operator authentication
162
Match?
no
yes
163
Enable Transponder Encoding

FIG. 16



Host or Network Computer
Database
171
Remote Computer or Mobile Phone
154
170
Optical Reader
173
Headset
174
Communi-cations
Optical Reader
Processing
Memory
Tag Transport
Tag Encoding
Tag Separation
Supply of Tags
Power Supply
Output Indicators
175A
175B
175C
175D
175E
175
175F
175G
175H
175J
175K
178
RF Transponder
Bar Code Symbols
179
176
177
Card with Printed Symbols
RF Transponder
178A
178B


FIG. 17




FIG 18




FIG 19




FIG 20


220
225
226
221D
221C
221E
224A
224A2
222A
221
224B
222B
223B
221A
223A
221B
222C
221F
221K
221G
221H
221J
227D
227E
227A
227F
227B
227C
228

FIG 21




FIG. 22


240
Scan Bar Codes
241
Generate RF data payload
242
Encode RF Tag
243
Verify RF Tag
244
OK?
No
Yes
245
Index to next tag if limit reached
246
Pull release liner to detach tag
247
Catch tag in rotation

FIG 23

# SYSTEMS, METHODS, AND DEVICES FOR COMMISSIONING WIRELESS SENSORS

## RELATED APPLICATIONS

The present application is a continuation-in-part application based on U.S. patent application Ser. No. 12/820,109 filed on 21 Jun. 2010, now U.S. Pat. No. 8,228,198, which claims benefit claims benefit under 35 USC Section 119(e) which is a continuation-in-part application based on U.S. patent application Ser. No. 11/465,712 (U.S. Pat. No. 7,830, 258) filed on 18 Aug. 2006, which claims benefit under 35 USC Section 119(e) of U.S. Patent Application No. 60/709, 713 filed on 19 Aug. 2005, and a continuation-in-part of U.S. patent application Ser. No. 12/124,768 (abandoned) filed on 21 May 2008, which claims benefit claims benefit under 35 USC Section 119(e) of U.S. Provisional Patent App. No. 60/939,603 filed on 22 May 2007, all by the same inventor Clarke W. McAllister. The present application is based on and claims priority from these applications, the disclosures of which are hereby expressly incorporated herein by reference.

## BACKGROUND

The present invention relates to a system, including methods and devices, utilizing wireless sensor devices and RFID (radio-frequency identification) transponders. Specifically, the present invention relates to a system incorporating novel devices and methods that enable point-of-use and on-demand commissioning of RFID transponder-equipped wireless sensors.

Radio-frequency identification (RFID) transponders enable improved identification and tracking of objects by encoding data electronically in a compact tag or label. And, advantageously, the compact tag or label does not need external, optically recognizable or human-readable markings. In fact, using the Gen2 EPC specification, a three-meter read-distance for RFID transponders is common—even on high-speed material handling lines.

Radio-frequency identification (RFID) transponders, typically thin transceivers that include an integrated circuit chip having radio frequency circuits, control logic, memory and an antenna structure mounted on a supporting substrate, enable vast amounts of information to be encoded and stored and have unique identification. Commissioning, the process of encoding specific information (for example, data representing an object identifier, the date-code, batch, customer name, origin, destination, quantity, and items) associated with an object (for example, a shipping container), associates a specific object with a unique RFID transponder. The commissioned transponder responds to coded RF signals and, therefore, readily can be interrogated by external devices to reveal the data associated with the transponder.

Current classes of RFID transponders rank into two primary categories: active RFID transponders and passive RFID transponders. Active RFID transponders include an integrated power source capable of self-generating signals, which may be used by other, remote reading devices to interpret the data associated with the transponder. Active transponders include batteries and, historically, are considered considerably more expensive than passive RFID transponders. Passive RFID transponders backscatter incident RF energy to specially designed remote devices such as interrogators.

Combining the benefits of the latest technology in RFID transponders with sensing devices, a broader class of devices called wireless sensors is emerging. Wireless sensors have a unique identity, sense one or more attributes within its environment, and report its identity and data corresponding to the sensed attributes. For example, a wireless sensor interprets environmental conditions such as temperature, moisture, sunlight, seismic activity, biological, chemical or nuclear materials, specific molecules, shock, vibration, location, or other environmental parameters. Wireless sensors are distributed nodes of computing networks that are interconnected by wired and wireless interfaces.



Wireless sensors, made using silicon circuits, polymer circuits, optical modulation indicia, an encoded quartz crystal diode, or Surface Acoustic Wave (SAW) materials to affect radio frequency or other signaling methods, communicate wirelessly to other devices. For example, certain embodiments of wireless sensors communicate on a peer-to-peer basis to an interrogator or a mobile computer. Communication methods include narrow band, wide band, ultra wide band, or other means of radio or signal propagation methods.

Generating a unique serial number is imperative, and is required for EPCglobal RFID tagging implementations. Serialization requires a central issuing authority of numbers for manufacturers, products, and items to guarantee uniqueness and to avoid duplication of numbers. Blocks of numbers are distributed to remote locations globally. Unless a product (or SKU) is serialized at one location, the numbering space is usually partitioned according to some method, or each remote location receives each number one-by-one. Either way, there is eventually a reconciliation of serial number usage with a granularity of either one or several numbers at a time.

A preferred method of generating unique serial numbers is to assign unique numbers in a central location, such as in a label converter facility where unique bar coded labels are printed. Each unique label is then packed and shipped to remote locations, usually either in sheets or rolls. Upon arrival at a manufacturing facility, rolls are loaded onto high speed label applicators that apply one serialized label onto each carton. As those serialized cartons move through the supply chain, they may eventually arrive at a case pick location, a receiving dock, or similar location where a serialized carton is selected for having an RFID transponder applied to it. Using a bar code scanner to read one or more bar codes sufficient information can be collected to uniquely encode that data into an RFID transponder and apply it to that carton.

The uniqueness of an identifier is critical to the success of almost any tracking system. Assuring uniqueness is not necessarily simple. A generically descriptive bar code can be matched to authorizations for selected numbering systems that provide additional data fields including a unique serial number or using algorithms that assure uniqueness through numerical representations of time and space.

Certain prior art systems use printer encoders to merge the printing and RFID transponder encoding operations into a single atomic transaction. This method is more expensive in every respect. It requires mobile distributed printing with nearly perfect networking implementations in order to achieve a smooth, easy, and regular manual transponder application process. This all comes at a higher price, size, and weight. Prior art implementations tend not to be mobile, as represented by U.S. Pat. No. 7,066,667 issued to Chapman et al. on 27 Jun. 2006 and include U.S. Pat. No. 5,899,476 issued to Barrus et al. on 31 May 2005, or by U.S. Pat. No. 6,246,326 issued to Wiklof et al. on 12 Jun. 2001, describe a device that commissions an RFID transponder with a printed label. This approach, however, introduces unnecessary waste, cost, and propensities for error. There is a growing category of applications that do not require anything other than a custom-encoded RFID transponder. This prior art calls for the inclusion of label printer hardware and related consumable

materials that are not necessary for many RFID applications. Unneeded printer mechanisms create unnecessary complexities, size, and weight. In some instances this additional bulk hinders practical mobile applications. The result is that tagging solutions that include printing result in a higher total cost of ownership than a pure RF tag encoding system.

So, despite recent advances in RFID technology, the state-of-the-art does not fully address the needs of simple, efficient, economical, high-volume, reliable deployment and commissioning of RFID transponders and wireless sensors. Large-scale adoption of RFID transponders depends on systems utilizing reliable, low-cost transponders deployed at thousands of distributed locations that implement simple and efficient manual transponder commissioning means. Such systems should further include processes for efficient commissioning of batches of RFID transponders, without the need for realtime wireless connectivity.

## SUMMARY OF THE INVENTION

The present invention overcomes the shortcomings of the prior-art attempts and, accordingly, provides systems, methods, and devices that commission RFID transponders on-demand and at a point-of-use utilizing wireless data transfer in a compact package that is well-suited to portable, mobile, or fixed use in multiple applications. The present invention is used for reading data from or encoding data onto wireless transponder data carriers with no external authorizations or queries required on a transponder-by-transponder basis. Additionally this invention teaches a preferred method and apparatus for commissioning RFID transponders without requiring continuous use of a screen or keypad to control operations. Further advantages of the present invention will be well-appreciated by those skilled in the art upon reading this disclosure including the appended figures of the drawing.

Authorizations for one or more classes of objects are preferably loaded into the encoder; where such authorizations include data fields such as manufacturer ID, item reference, manufacturer code lengths, filter values (that designate packaging levels such as item, case, pallet, etc.), serial number starting point for a block, and other pre-determined parameters. Such information is preferably loaded into the memory of the encoder in advance of tag commissioning operations. Thus if loaded with information for more than one object class, the encoder does not have sufficient information to proceed with encoding a transponder until a single object class is selected for the present RFID transponder to receive; an ambiguity therefore exists that is preferably resolved with information entered by an operator using either a keypad or a bar code scanner. Reading printed indicia such as a bar code is a preferred method to resolve the ambiguity as to which object class the next RFID transponder is to receive a number from. Bar codes are used to eliminate errors and ambiguities that enable the encoder to locally generate or replicate data for encoding into a data carrier such as an RFID transponder.

This type of data production and/or replication process is very fast and efficient. There is no absolute need to query a database in real time; hence there is no need for continuous wireless network connectivity. This simplification eliminates the possibilities for non-deterministic network delays. Non-deterministic delays are delays that cannot be guaranteed, usually due to the probabilistic nature of packet collisions that are common in Ethernet and WiFi. By eliminating the need to access a network database, the variable non-deterministic delays caused by changing database sizes, changing record counts, and database user load fluctuations are completely circumvented. Reduction or outright elimination of non-deterministic delays helps manual labor operate at maximum efficiency, allowing them to achieve a regular and dependable cadence in their transponder application processes.

For example, in one embodiment the present invention consists of an encoder for commissioning RFID transponders. The encoder consists of an RFID interrogator module adapted to enable encoding predetermined data according to a commissioning algorithm and communicating with an internal antenna, the antenna being adapted to encode the predetermined data on the RFID transponder; a memory storage device for storing at least a portion of the predetermined data; a processing means for controlling and communicating with the memory storage device, the RFID interrogator and the internal antenna; a means for providing a supply of RFID transponders, the transponders configured for tensile extraction from the encoder or, preferably from means for providing a supply of RFID transponders comprising a cartridge; and a means for presenting the RFID transponder within an operable range of the internal antenna or near field coupler to enable encoding of the predetermined data.

In further embodiments, the present invention includes a method for commissioning RFID transponders comprising: providing a roll or sheet of RFID transponders; providing a cartridge or other pre-packaged self-contained supply of RFID transponders; providing an encoder; inserting the roll or sheet in the cartridge or other pre-packaged self-contained supply of RFID transponders; coupling the cartridge to the encoder; acquiring information to encode from printed indicia; encoding the information on at least one RFID transponder; and adapting the process of attachment of the encoded transponder to the target surface along a vector that is nearly parallel to the target surface based upon real time feedback from the surrounding environment.

## DRAWINGS

FIG. **1** is a block diagram of the system and environment according to one embodiment of the present invention.

FIG. **2** is a top view of a possible RFID transponder according to one embodiment of the present invention.

FIG. **3** is a schematic end-view of the RFID transponder of FIG. **2**.

FIG. **4** is a top view schematic drawing of a sheet or roll of a plurality of RFID transponders of FIG. **3**.

FIG. **5** is an offset orthogonal view of a mobile encoder according to one embodiment of the present invention.

FIG. **6** is a schematic block diagram showing some components of the mobile encoder of FIG. **5**.

FIG. **7** is a schematic cross section view showing electro-mechanical components of one embodiment of a mobile encoder.

FIG. **8** is a schematic cross section of an encoder according to the present invention.

FIG. **9** is a frontal-offset view of a hand-held, mobile encoder according to the present invention.

FIG. **10** is a schematic cross section of another encoder according to the present invention.

FIG. **11** is a flow chart of a smartphone scan and transponder encode method according to the present invention.

FIG. **12** is a flow chart of a tagging method according to the present invention.

FIG. **13** is a flow chart of a commissioning method according to the present invention.

FIG. **14** is a diagram of a serialization method according to the present invention.

FIG. **15** is a system block diagram according to the present invention.

FIG. **16** is a flow chart of a biometric authentication method according to the present invention.

FIG. **17** is a block diagram of the system and environment according to one embodiment of the present invention.

FIG. **18** is a top view of a possible RFID transponder according to one embodiment of the present invention.

FIG. **19** is a material stack specification of an RFID transponder according to one embodiment of the present invention.

FIG. **20** is a side view of a web of release liner containing RFID transponders, provided on a source roll, stretched tight around a peel device, and advanced forward onto a take-up reel according to one embodiment of the present invention.

FIG. **21** is a side view of a handheld mobile encoder with an integrated bar code scanner according to one embodiment of the present invention.

FIG. **22** is a diagram of a smartphone with FIPS 140-2 module and near field couplers according to one embodiment of the present invention.

FIG. **23** is a flow chart of a first method according to the present invention.

## DESCRIPTION OF THE INVENTION

Making reference to various figures of the drawing, possible embodiments of the present invention are described and those skilled in the art will understand that alternative configurations and combinations of components may be substituted without subtracting from the invention. Also, in some figures certain components are omitted to more clearly illustrate the invention. In some figures similar features share common reference numbers.

To clarify certain aspects of the present invention, certain embodiments are described in a possible environment—as identification means for containers. In these instances, certain methods make reference to containers such as loaded pallets, paperboard boxes, corrugated cartons, pharmaceutical containers, and conveyable cases, but other containers may be used by these methods. Certain embodiments of the present invention are directed for use with steel drums, commercial corrugated shipping cartons, tagged pallet-loads of shrink-wrapped cases, consumer-goods packaging, consumer goods, automobile windshields, industrial components, or other methods of identifying objects using RFID transponders or wireless sensors, or both. In certain embodiments the target surface to which a transponder will be attached is a container. In some applications the target surface is moving while the encoder device is stationary. Furthermore the moving target surface may be objects on a conveyor. In yet other embodiments the target surface may be a web of release liner from which encoded transponders will be later removed and applied to an object for identification.

Some terms are used interchangeably as a convenience and, accordingly, are not intended as a limitation. For example, transponders is a term for wireless sensors that is often used interchangeably with the term tags and the term inlay, which is used interchangeably with inlet. This document generally uses the term tag or RF tag to refer to passive inlay transponders, which do not include a battery, but include an antenna structure coupled to an RFID chip to form an inlay which is generally thin and flat and substantially co-planar and may be constructed on top of a layer of foam standoff, a dielectric material, or a folded substrate. One common type of passive inlay transponder further includes a pressure-sensitive adhesive backing positioned opposite an inlay carrier layer. However, certain aspects of the present invention work equally well with active inlay transponders. A third type: a battery-assist tag is a hybrid RFID transponder that uses a battery to power the RFID chip and a backscatter return link to the interrogator. Further, this document uses programmable RFID transponders interchangeably with RFID transponders. Programmable transponders enable data to be written or stored more than once.

Suitable environments or applications for certain aspects of the present invention include: traditional conveyor line or other high-speed machinery with automated transponder printing, encoding, and attachment; hand attachment of transponders (a method that often is referred to as "slap and ship"); and a novel category of mobile transponder encoders (as will be more fully described herein); shipside receiving of automobiles; case picking operations that include selective tagging process steps; and receiving untagged cartons into an RFID-enabled retail store or a manufacturing plant.

The systems, methods, and devices of the present invention utilize an RFID transponder or wireless sensors as a component. Certain RFID transponders and wireless sensors operate at Low Frequencies (LF), High Frequencies (HF), Ultra High Frequencies (UHF), and microwave frequencies. HF is the band of the electromagnetic spectrum that is centered around 13.56 MHz. UHF for RFID applications spans globally from about 860 MHz to 960 MHz. Transponders and tags responsive to these frequency bands generally have some form of antenna. For LF or HF there is typically an inductive loop. For UHF there is often an inductive element and one or more dipoles or a microstrip patch or other microstrip elements in their antenna structure. Such RFID transponders and wireless sensors utilize any range of possible modulation schemes including: amplitude modulation, amplitude shift keying (ASK), double-sideband ASK, phase-shift keying, phase-reversal ASK, frequency-shift keying (FSK), phase jitter modulation, time-division multiplexing (TDM), or Ultra Wide Band (UWB) method of transmitting radio pulses across a very wide spectrum of frequencies spanning several gigahertz of bandwidth. Modulation techniques may also include the use of Orthogonal Frequency Division Multiplexing (OFDM) to derive superior data encoding and data recovery from low power radio signals. OFDM and UWB provide a robust radio link in RF noisy or multi-path environments and improved performance through and around RF absorbing or reflecting materials compared to narrowband, spread spectrum, or frequency-hopping radio systems. Wireless sensors are reused according to certain methods disclosed herein. UWB wireless sensors may be combined with narrowband, spread spectrum, or frequency-hopping inlays or wireless sensors.

System and Encoder Overview

Referring to FIG. **1** the present invention includes a system for commissioning wireless sensors at a point of use and on-demand. For example, in one embodiment, the present invention incorporates a mobile encoder device **30**, which may be attached to a belt of an operator and powered by rechargeable batteries **60**. The mobile encoder is in wireless communication with a remotely located host computer. The operator can selectively (on-demand) enable the mobile encoder to commission a transponder based on various criteria, including input received from a mobile bar code scanner, for example.

FIG. **1** shows one system **10** according to the present invention in a typical environment, such as a packaging facility wherein a collection of entities with visual external labels **15** exist and a sub-set (or all entities) need to be associated with a wireless RFID transponder, tag, or label. The object **17** needing an RFID transponder could be a packing container having an assorted collection of entities **15**. As entities **15** are

pulled from collection **176**, a traditional optical reader **13** (human or machine) interprets the visual external label. Information from the external, visual label is correlated to information stored in a centralized location, represented by a network computer **11** having a database. The information taken by the optical reader **13** is transmitted to the network computer **11**. System **10** includes a wireless connection between the remote computer **20** and the mobile encoder **30** either directly or through a common wireless access point. Additionally, a wireless connection could occur between the remote computer **20** and the host computer **11**, and in this embodiment, the remote computer **20** is in physical connection with the mobile encoder. In yet another embodiment, the remote computer **20** wirelessly connects to both the mobile encoder **30** and the host computer **11**. Optionally, the optical reader **13** can be incorporated in the encoder **30**.

Referring to FIGS. **3** and **4**, in further embodiments, the present invention incorporates a mobile encoder device **175**, **30**, or **220** which may be held in the hand of an operator. Mobile encoder device **175**, **30**, or **220** is preferably powered by rechargeable batteries or a fuel cell. System **170** includes at least four possible intermittently connected entities if they are present and connected: mobile encoder **175**, remote computer or mobile phone **154**, optical reader **173**, and headset **174**. A preferred short range wireless connection means **175**A such as a WLAN (Wireless Local Area Network) or PAN (Personal Area Network) may be established from time to time between mobile encoder **175** and remote computer or mobile phone **154**, optical reader **173**, and/or headset **174**. There is a preference for low power wireless connection apparatus within mobile encoder **175** so as to realize the greatest possible battery life in light weight mobile encoder **175**. Mobile encoder **175**, **30**, or **220** is in intermittent wireless communication with a mobile phone or computer **154** typically at close range through wireless communication means **175**A. Database and associated host computer **171** may be housed at a remotely located facility that may optionally be accessed over a large distance through remote computer or mobile phone **154**. A mobile phone is a preferred bridge between two or more wireless networks, for example a PAN and a wireless subscriber network that supports wireless data services for ultra mobile and remote tagging applications. Continuous wireless connection to a host database is not required for ongoing tag commissioning process steps disclosed herein.

RFID tags such as those using EPCglobal numbers requires uniqueness of the numbers that are encoded. GS1 is a central authority that prescribes a set of hierarchies for each key type (type of identity such as an SGTIN) whereby GS1 designates itself as the central issuing authority for each key type. Authority is passed down in a hierarchical manner to member companies. Each member company has the authority to further allocate numbers from its upper level database to as many lower database levels as it deems necessary to distribute number authority throughout its enterprise.

Quasi-autonomous RFID transponder encoding authority is achieved when an external number issuance authority allocates to the encoder blocks of numbers for specific object classes. A preferred embodiment for quasi-autonomous transponder encoding authority is realized when large pre-authorized blocks of serial numbers are made available to encoder **175** or **30** to utilize on object classes as objects of a class are presented for tagging. A preferred method of providing pre-authorized blocks of object class serial numbers is to subdivide the entire object class serial number space into sectors that are defined by a limited number of MSB's (Most Significant Bits) of the serial number field. The object class serial



number space is defined by the number of serial number bits that are used in a specific standard, such as a particular EPCglobal key type, for example an SGTIN-96 and is defined in a corresponding specification such as the GS1 EPCglobal EPC Tag Data Standard. Again using the SGTIN-96 as an example, there are a total of 38 bits used to define the entire serial number space which contains $2^{38}$ unique numbers. For example the upper 14 bits could be designated as the most significant bits for a particular embodiment. In that case the object class serial number space would be comprised of 16,384 sectors. Since in this example there are 14 most significant bits within a 38 bit serial number field, there must be 38 minus 14 bits of lesser significance, which equals 24 bits. Therefore the lower 24 bits represent 16,777,216 unique serial number values. Once a sector is allocated to a lower level within an authority hierarchy, it is referred to as a block. Each allocated block of serial numbers represents authority for encoding objects of an object class that can either be used by an encoder for encoding transponders, or allocated to a lower level in the authority hierarchy.

In a preferred embodiment serial number block sizes are sufficient to operate encoder **175** or **30** for extended periods of time without any further external authorization steps. For example autonomous operation for a week or more is possible with sufficiently large block sizes. In the previous example the encoder could encode over 16 million objects of an object class without the need to reconnect with a higher level authority. If 10,000 objects of an object class are encoded each day, then the encoder could operate in a quasi-autonomous mode for up to 1677 days or over four years without receiving further authorizations from a higher level authority. Block allocations are preferably assigned with reference to how many encoders **175** or **30** are authorized to operate within the facilities of the owner of certain object class numbers.

Authorizations for one or more classes of objects are preferably loaded into encoder **175**, **30**, or **220** from an external authority where such authorizations include data fields such as manufacturer ID, item reference, manufacturer code lengths, filter values (that designate packaging levels such as item, case, pallet, etc.), serial number starting point for a block, and other pre-determined parameters. Such information is preferably loaded into the memory of the encoder in advance of tag commissioning operations. Thus if loaded with information for more than one object class, encoder **175**, **30**, or **220** does not have sufficient information to proceed with encoding a transponder until a single object class is selected for the present RFID transponder to receive; an ambiguity therefore exists that is preferably resolved with information entered by an operator using either a keypad or a bar code scanner. Reading printed indicia such as a bar code is a preferred method to resolve the ambiguity as to which object class the next RFID transponder is to receive a number from. Bar codes are used to eliminate errors and ambiguities that enable encoder **175**, **30**, or **220** to locally generate or replicate data for encoding into a data carrier such as an RFID transponder.

GS1 is a leading global organization dedicated to the design and implementation of global standards and solutions to improve the efficiency and visibility of supply and demand chains. GS1 defines EPCglobal SGTIN number fields as having a company prefix, an item reference, a partition value, and a filter value that comprise the object class information. A unique serial number is then added to that information to create each unique instance within each object class.

In a preferred embodiment, a block is allocated and managed using three numbers: a starting number that is the first serialized instance of a block, a block size which represents

the total number of instances in the block, and a counter or index that represents how much of the block has been used during an encoding process. Using these three numbers and an optional lock bit, a simple database of object class authorizations can be built.

A preferred embodiment utilizes RFID authorization transponder **178**A and a printed substrate **1786** to physically handle object class serial number issuance authorizations. Authorization transponder **178**A is interrogated by transponder reading/encoding means **175**H. Preferred embodiments use the 96-bit EPC memory bank for specifying the block starting number, including the company prefix, item reference, partition value, filter value, and base serial number. The User Memory bank is used to hold and transfer the block size (preferably 16-bits), counter or index value (preferably 16-bits), a 16-bit header to identify the transponder as a valid member of a class of authorization transponder, a lock bit, and a CRC value to detect errors in all of the data fields. For example a CRC error would detect errors in storage, transponder selection, or data transmission. In preferred embodiments reading of data blocks from more than one RFID transponder would be avoided by selecting a transponder, checking that it is the correct type, contains valid authorization data, contains a valid header that signifies that it is an RFID authorization transponder **178**A, and that all data read correctly verifies with a dedicated error detection field such as a CRC.

RFID authorization transponder **178**A is preferably adhered to printed substrate **178**B so that an operator can visually identify what object class or SKU is managed by the affixed authorization transponder **178**A. A picture, icon, bar code, or human readable symbols are all useful for identifying the object class. An operator presses a button or scans a bar code that prompts encoder **175** to read and store the tagging authorization held by authorization transponder **178**A. Once read, authorization transponder **178**A is preferably electronically marked as 'consumed' or 'locked' by transponder encoding means **175**H. EPC transponder ID fields that identify a specific type of chip are preferred for selecting the proper transponder, even when other RFID transponders are within range of the antenna or near field coupler of transponder encoding means **175**H.

A collection of authorization transponders **178**A comprises a database that can be physically transported without the need for a wireless communications link to encoder **175**. Once read, database records are preferably stored in internal memory means **175**G. In a preferred embodiment 12 to 14 bytes of Flash memory is used for each record to allocate 250 to 65536 instances of an object class, whereby the first byte of an EPC number is a fixed header value can be replaced in Flash memory by 8 bits of the allowable block size. One or two bytes in RAM are used to count or index through the block allocation as it is used. Thousands of data records of this type can easily fit into the memory space of an economical 8-bit microcontroller. In a preferred embodiment, where the GS1 SGTIN-96 header is replaced in memory with an 8-bit block size authorization, 300 records for authorizing up to 255 instances per record, can be used to safely manage at least 500,000 tagging records using 24,000 bytes of Flash memory and 2000 bytes of RAM. Other embodiments using more bits to authorize and control larger blocks of numbers is possible at a slightly larger expense of memory.

A preferred embodiment uses a computer, preferably a smartphone such as an iPhone from Apple Inc. of Cupertino, Calif. as a lower database level to transfer encoding authorizations from upper level database authorities to RFID encoders. A smartphone such as the iPhone or an Android phone using software from Google would be a preferred embodiment of a lower database level and or an encoder using an antenna or near field coupler similar to near field coupler **224**A**2** of FIG. **21** or **238***a* or **238***b* of FIG. **22** to couple with RFID transponders for encoding and verification. The iPhone also has cellular data transmission radios and software stack to enable the iPhone to access remotely located servers in a cloud computing architecture.

The smartphone establishes a connection with a cloud-based server using JavaScript, ASP, JSP, PHP, Perl, Tcl or Python scripts to access a database such as mySQL that is available from Oracle Corporation of Redwood Shores, Calif. Using structured query language, SQL database tables are preferably used to store tag commissioning data, configuration information, and serial number block allocation records. SQL queries provide information from database tables to the script, passing the result over the Internet, to the smartphone, which also then routes information to designated RFID encoders. Encoders are preferably identified by their media access control (MAC) address or a UUID which is guaranteed to be unique and is used by the smartphone as a lower database level to transfer encoding authorization to a specific encoder.

Preferred embodiments of encoder **175**, **30**, or **220** will encode all of the GS1 identity types. Such types include the General Identifier (GID-96), Serialized Global Trade Item Number (SGTIN), Serial Shipping Container Code (SSCC), Serialized Global Location Number (SGLN), Global Returnable Asset Identifier (GRAI), and the Global Individual Asset Identifier (GIAI). Other preferred embodiments are used to encode numbers that are a part of other numbering systems.

Data records are preferably loaded and stored through commands that are transmitted over wireless communication means **175**A. In preferred embodiments, batch mode commands can be used in any of three ways: (1) to immediately affect the current operation by starting a batch tagging process for a specified SKU or object class; (2) to store authorizations in memory means **175**G; and (3) to store authorizations in stored-value RFID transponder **178**A.

When external connection is necessary, wired or wireless communication with an external host or numbering authority is established. Wireless communication means **175**A is preferably a Wi-Fi or Bluetooth connection. A wireless node of a Bluetooth personal area network is used according one embodiment of the present invention. Model 100-SER manufactured by EmbeddedBlue of Poway, Calif. and the BISMS02 from EZURiO Ltd., a subsidiary of Laird Technologies, Inc. of Chesterfield, Mo. are examples of preferred OEM Serial Bluetooth modules. Other wireless interfaces may alternatively be used to achieve Serial Port Profile and other types of connectivity between encoder **175** and remote computer or mobile phone **154** and/or optical reader **173**.

Other preferred embodiments of mobile encoder **175** and system **170** replace wireless communication means **175**A with a cable, resulting in an embodiment of mobile encoder **175** with a tethered bar code scanner. A key advantage of an alternative embodiment of system **170** that utilizes a wired connection to optical reader **173** instead of wireless communication means **175**A is a very simple solution having virtual immunity to any surrounding RF interference that might raise the noise floor hindering wireless communications.

The operator can cause mobile encoder **175**, **30**, or **220** to commission a transponder by scanning certain printed bar code symbols received through optical reader **173** which is connected to encoder **175** through wireless communication means **175**A. Or alternatively internal optical reader **175**F is used to scan printed bar code symbols. In either case data

from optical reader **173** or **175**F is delivered to processing means **1756**. Certain preferred embodiments of system **170** use optical scanners with self-contained symbol decoding capabilities to deliver decoded symbol information to processing means **1756**. Certain other embodiments of system **170** relies on processing means **1756** to conduct some or all decoding operations to derive information from scanned symbols.

The information derived from the optical reader **173** or **175**F is used by mobile encoder **175** to either directly or indirectly encode data into RF transponder **178** while it is still physically within mobile encoder **175**. Mobile encoder **30** uses external optical reader **173**, and alternatively mobile encoder **220** uses internal optical reader **175**F, as embodied in reader **226** of FIG. **21**. Preferred embodiments of optical reader **226** are mechanically aligned relative to transponder encoding means **175**H or more specifically with the antenna or near field coupler of RFID interrogator **224**A. Spatial alignment assures that an operator will be able to comfortably scan bar codes and then encode and apply RFID transponders along a line of movement such that the operator can easily assure proper placement of encoded transponders.

Symbol decoding functions may be physically, electrically, or logically separated from symbol scanning operations. One preferred embodiment of optical reader **173** is a model CHS-7M, CHS-7P, CRS-9M or CRS-9P Bluetooth ring scanner.

Processing scanned commands involves a processing step to determine that a bar code should be interpreted as a command or configuration instructions rather than as bar code **179** that identifies an object that is to be tagged. Commands are used to alter the flow and operation of mobile encoder **175**.

FIG. **21** is a preferred embodiment of a mobile encoder wherein optical reader **226** is an OEM bar code scanner manufactured by such companies as Intermec or Motorola and is a preferred embodiment of optional internal optical reader **175**F shown in FIG. **17**.

In a preferred embodiment one or more bar codes are pre-printed and applied as symbol **179** on entity **177** in a manufacturing facility or other suitable location. Such bar codes are described in ISO/IEC draft document PDTR 24729-1 and are more generally referred to as one or more bar codes having Application Identifiers (AI) 01 and 21 encoded into them, and preferably include header information and other control bits that are required for certain protocols. AI 01 is used to represent the Stock Keeping Unit (SKU) as a GS1 Global Trade Item Number (GTIN). AI 21 is used to serialize the SKU. Together the two AI's are used to specify a GS1 serialized GTIN (SGTIN). Bar codes can also be used to specify data payloads that use numbering systems other than the EPC numbering system. The Application Family Identifier (AFI) also plays an important role in designating alternative numbering authorities.

This preferred method that is described by the flow chart in FIG. **23** will allow batch mode operation where there are at best intermittent connections with remote computer **154**. This preferred method allows existing label application and/or printing hardware located on existing manufacturing lines to provide in printed symbolic form all data that would be encoded into an RF transponder. By providing printed symbols, manufacturers do not have to incur either the cost of that transponder or the special equipment that is required to encode and apply RF transponders.

Optical reader **173** or **226** is described above and is used as the primary source of real time data input for the mobile encoding system that uses an embodiment such as mobile encoder **30** or **220**. Optical reader **173** or **226** is also preferably used to scan special bar codes that instruct mobile encoder **175**, **30**, or **220** to perform certain prescribed functions which will be described below.

Certain preferred embodiments of system **170** include headset **174** which may be a headset worn by the operator or a Bluetooth-linked loud speaker that is mounted to a pallet jack or fork lift truck. Headset **174** is optionally used by system **170** to give instructions, confirmation signals, or warnings to the operator. Synthesized speech or audible tones are used to interact with the operator through headset **174**.

In these aforementioned embodiments, the mobile encoder **30** is a portable device that can be easily mounted in a fixed location, carried such as mobile encoder **220**, or worn by a human operator such as mobile encoder **30**, or hung from a suspended retractable tool cable. As such, the mobile encoder **30** includes an internal power source **175**E such as a rechargeable lithium-ion battery and would further include a handle or a belt-clip for ease of use. In another embodiment, the mobile encoder can be attached to a high-speed conveyor line. In such an application, the on-board battery could be replaced or augmented by a physical connection to a remote power source. Further, the computer **20** could have wired connects to the host network **11**. Further details of possible configurations of the mobile encoder will be further detailed in subsequent sections of this disclosure.

In the system **10** of FIG. **1**, the mobile encoder **30** carries a supply of un-commissioned (or blank), or securely encodable RFID transponders **175**J, **185**, **42**, or **221**E. Once the desired data is accumulated and presented to the encoder **30** from the computer **20**, the encoder commissions an RFID transponder, using transponder transport means **175**C and transponder encoding means **175**H and any one of several preferred encoding algorithms to program, creating an RFID tag or label **50** for the object **177**. Transponder separation means **175**D is used to separate a properly encoded transponder **178** from release liner conveyance web **182** by breaking the bond at adhesive layer **181**D on the leading edge of transponder **178**. Transponder separation means **175**D is preferably a peel device **183** as shown in FIG. **20** or peel device **222**B in mobile encoder **220**. Peel devices **183** or **222**B are preferably made from anti-static plastic, metal, or other material that will conduct electrostatic charge away from transponder **178** and release liner **182**. The commissioned tag or label **50** can then be applied, linked, or otherwise associated with the object by known means including a human operator or a machine transfer.

RFID Transponders

FIG. **2** shows a preferred embodiment of an RFID transponder **50**. RFID transponders, in some embodiments, comprise an RFID integrated circuit (IC) device (or "chip") **56** of FIG. **3** or **180** of FIG. **18** bonded to an antenna apparatus, formed on a substrate that is often plastic such as Mylar®, polyester, or PET. One way to form an antenna structure is to etch copper from a substrate. An alternate printed transponder includes printing multiple layers of conductive ink onto a substrate. One additional method includes stamping UHF antennae from thin sheets of aluminum, or by selective aluminum deposition onto a substrate. In certain embodiments, RFID transponders and wireless sensors are recovered from waste streams for reconditioning, reprogramming, and reuse.

Other suitable RFID transponders include designs that combine a dielectric spacer behind the antenna by separating the metallic antenna inlay **181**C from surrounding metals that may detune it, or liquids that may absorb RF energy from it. The dielectric spacer creates a transponder that performs well over a broad range of packaging conditions. The dielectric material is a foam standoff material or an expanding mechani-

cal structure that provides lift from the target object and also a more robust design also includes features to protect the transponder from damage.

In certain embodiments, the RFID transponder is both programmable and mechanically configured for tensile extraction from a protective enclosure.

In preferred embodiments, hundreds or thousands of instances of RFID transponder **178** are manufactured on a continuous web of flexible material with a spatial separation between them, preferably at regular intervals. Certain preferred embodiments use adhesive-backed transponders **178** adhered to release liner **182** as shown in FIG. **20**, while other embodiments use the transponder material as its own conveyance that is severed from the rest of the web at predetermined locations, preferably after encoding and verifying transponder **178** is properly functioning.

In preferred embodiments of the present invention, the face stock material has a physical outline that is not much larger than the physical outline of the inlay itself. This is in contrast to labels which can have at least twice the surface area of the inlay or a direct-printed antenna structure in order to provide space for printed information. By having a label outline that is so much larger than the inlay surface area, there are a many possible combinations of inlay placement within the boundaries of a large printable label. This creates a problem and a challenge for printer/encoders that have to find and locate an inlay before attempting to encode it. By contrast, the present invention uses the detectable optical characteristics of the tag's minimal physical outline to position the transponder for encoding. This transponder positioning method is superior and an improvement over prior art that uses printed label stock as a carrier for RFID inlays wherein the physical dimensions of printed labels are not in any way a reliable indication of the location of the RFID inlay within the label. This is another example of how demand label printing further complicates RFID transponder encoding.

In one embodiment that is an exception to the minimal outline transponder design and positioning method described above, transponders that have a very long physical shape can be used to create a loop to secure an encoded transponder to a tree, a bush, or the handle of a piece of luggage. Preferred embodiments of such transponders are folded or rolled in order to package them onto a dispensing roll or packaged into a magazine or cartridge in a fan fold pattern. The resulting bundle of back-and-forth 'Z' folded or fan folded face stock material results in a compact package that minimizes the amount of release liner that needs to be wasted for each tag. Each z-folded transponder is then easily encoded and dispensed from encoder **175**, **30** or **220**. Transponders that can be encoded, verified, dispensed, and unfolded are advantageously used in forestry, ornamental nurseries, and airline baggage tracking applications where manual tagging is required.

In another embodiment, transponder **178** is pushed out of encoder **175** instead of being pulled out through tensile extraction. A transport mechanism for pushing transponders utilizes a gripping method such as friction or teeth that penetrate the webbing. Although there is a risk of jamming or mutilating the webbing, the advantage is that there is no need for a release liner to pull the transponder supply through encoder **175** using tensile extraction. A preferred 'tractor feed' embodiment mitigates the risk of web mutilation by utilizing a regular pattern of precut holes along one or both edges of the webbing, into which cog members of a drive mechanism engage to advance the webbing. A tractor feed embodiment is part of Transponder Transport Means **175**C of FIG. **17** whereby a motor and gear train delivers drive torque to the web through friction rollers, penetrating teeth, cogs, or other mechanical engagement means. In such an embodiment, the preferred transponder separation means is a web cutter that is used to separate encoded transponders from unencoded tags. A web cutter can be either active or passive, in other words cutting force can originate with a motorized mechanism or with an operator's handling during dispensing and transponder detachment. A row of plastic or metal saw teeth is a preferred embodiment of a passive transponder separation device.

In another preferred embodiment, transponder **178** is manufactured on a high speed press, a bar code is printed onto face stock of transponder **178** and information that is representative of that bar coded information is also encoded into microchip **180**. Then encoder **30** or encoder **220** preferably read that information from RFID microchip **180** and associate it with a transponder commissioning process that may or may not include the programming of additional information into RFID microchip **180**. This is a novel method of reading bar coded information on transponder **178** without using a bar code scanner to do so within encoder **30** or **220**.

In one embodiment, additional transponder layers include a thin and flexible energy cell comprising two non-toxic, widely-available commodities: zinc and manganese dioxide. One suitable energy cell is developed by Power Paper Ltd. of 21 Yegia Kapayim Street, Kiryat Arye, Petah Tikva, P.O.B. 3353, ISRAEL 49130, and incorporates an innovative process that enables the printing of caseless, thin, flexible and environment-friendly energy cells on a polymer film substrate, by means of a simple mass-printing technology and proprietary inks. The cathode and anode layers are fabricated from proprietary ink-like materials that can be printed onto virtually any substrate, including specialty papers. The cathode and anode are produced as different mixes of ink, so that the combination of the two creates a 1.5-volt battery that is thin and flexible. Unlike conventional batteries, this type of power source does not require casing.

A top layer of an RFID transponder assembly optionally comprises a paper face-stock **181**A, which is a very low-cost material but also is the least environmentally resilient. UV-resistant plastic face-stock **181**A generally provides the best survivability in outdoor and rough-service environments, and also provides the best protection for the RFID transponder assembly.

A bottom layer of pressure-sensitive adhesive (PSA) **181**D often is used for attachment of transponders to objects and often is referred to as a wet inlay or a wet tag or a wet transponder because of adhesion layer **181**B. Alternatively, a layer of clear, translucent, or opaque adhesive-backed film or tape is used to attach the transponder or wireless sensor to object or container. The tape, any thin, low cost, flexible material with a self-adhesive backing, such as a conventional packing tape, is well-suited for this method of attachment. The tape may be formed into various shapes to achieve the requirements of this method. Certain embodiments may use tape that is preprinted with certain logos, marks, symbols, bar codes, colors, and designs. Suitable adhesive-backed tape must not—or at least minimally—absorb radio frequencies within the range of frequencies used by the transponder or tag. The tape material, also, must not corrode the device or otherwise hamper its functionality.

Certain embodiments use a type of packing manufactured specifically for a given encoder. Packing tape can be single-coated pressure-sensitive adhesive tape or, alternatively, media constructed with multiple layers including a backing layer. Certain backing layers are constructed on a plastic film having one or more layers. Certain backing layers are made

from plastic resins such as polypropylene (PP), polyethylene (PE), or copolymers of PP, PE, PVC, polyesters, or vinyl acetates. Certain embodiments of PP are mono-axially oriented polypropylene (MOPP), bi-axially oriented polypropylene (BOPP), or sequentially and bi-axially oriented polypropylene (SBOPP). Certain backing layers are biodegradable. Certain backing layers are coated with a pressure sensitive adhesive on one side and a low adhesion release coating on the other side to reduce the amount of power required for the encoder to unroll the tape for application.

FIG. **3** shows a possible embodiment of an RFID transponder **50** that does not include an encapsulation layer comprising a separate tape. In this example, an adhesive layer **52** bonds with antenna layer **54** that is bonded to inlay substrate layer **58** and integrated circuit **56**. Inlay substrate layer **58** and face-stock layer **51** provide resistance against electrostatic discharge (ESD) into antenna layer **54** or chip **56**.

Other constructions for RFID transponders include one or more additional layers of high-dielectric material that encapsulate or substantially cover the inlay. In general, the thicker the dielectric layer the higher the voltage must be to initiate a flow of electrons through a dielectric layer. This results in higher ESD voltage ratings. Also, it is well known to those skilled in the art that thicker dielectric layers between antenna layer **54** and any other metal or liquid also tends to reduce parasitic loading of the antenna whereby maintaining antenna tuning for proper coupling to interrogators within a specified UHF band. In such embodiments, the integrated circuit chip and antenna bond to an adhesive layer and are protected from a discharge path through the tape layer by its particular thickness of dielectric material. A second dielectric layer bonds to the inlay substrate by a second adhesive layer, so that a low voltage discharge path is nonexistent around the two layers of tape substrate.

In another possible embodiment of an RFID transponder, the inlay substrate provides a second layer of ESD resistance against a discharge path through an outward-facing tape layer and associated adhesive layer. This construction protects the antenna and chip from electrostatic discharge originating from any direction. The encapsulation tape layer bonds to the antenna and chip via an adhesive layer and provides no adhesive bond to the transport container when the transponder is commissioned, and therefore depends on separate adhesive zones to attach to the container of interest.

In another possible embodiment, an RFID transponder includes multiple layers of ESD resistant material. For example, an outer layer substrate bonds to an inner substrate by an intermediate adhesive layer. A second adhesive layer bonds with the chip and antenna. The inlay substrate faces inward and presses against a transport container when the transponder is commissioned.

The contemplated adhesives in the various RFID transponder embodiments create strong and permanent bonds between tapes and inlay layers over a certain practical range of operating temperatures.

Because RFID transponders are designed to adhere to a container, one face of an external layer includes a pressure-sensitive adhesive. This external adhesive, however, must not cause mechanisms associated with the commissioning devices to jam. To prevent unwanted sticking of the RFID transponder, a transport layer protects the sticky, external adhesive. The transport layer is either a release liner such as a silicone-treated paper liner or a net (or mesh) web. A net or mesh web offers two principal advantages: less weight and being recyclable or reusable. A comparison of the weight of a net with a higher percentage of open area to a typical sheet of release liner reveals that the netting is lighter for any given section of comparable size. Environmental problems of disposal of release liner are well known. Mesh or netting, comprised of recyclable resins, is recovered after each use so that the mesh or net can be either reused or recycled for its constituent materials.

In one possible embodiment the mesh or netting is made of plastic such as nylon, polypropylene, polyethylene, HDPE, Teflon, or other resins. In other embodiments the mesh or netting is fabricated from metal or carbon-impregnated plastic to provide a conductive path to bleed electric charge away from points of accumulation.

Other advantages of a net or mesh transport layer include a substantial percentage of the adhesive not in contact with anything during storage and commissioning. When stored in a roll, a small percentage of the adhesive layer makes contact with the backside of the roll through the openings in the mesh. Thus, a small amount of energy is required to unroll the spool during transponder commissioning, yet there exists a certain amount of adhesion to prevent a converted spool from unraveling.

In other possible embodiments, the RFID transponders can include a surface suitable for human or machine readable, visible, external markings including bar-code symbols or alpha-numeric sequences.

FIG. **4** shows another embodiment of RFID transponders **50** grouped on sheet stock **59** such as rolls or z-folded sheets that enables a plurality of transponders to be carried on a continuous web or traditional release liner. Other certain embodiments use transponders that are stacked and loaded into magazines for transport, handling, and automated dispensing. In certain embodiments, the magazines contain metallic shielding to protect transponders and inlays from electrostatic discharges (ESD).

In certain embodiments an RFID encoder is combined with a sensor suite **218** as shown in FIG. **10** to enable semi-automated tag application to desired objects. In one embodiment, a semi-automatic encoder/applicator is created by integrating a single sensor device. The sensor responds to changes in light, capacitance, pressure, acoustics, or optical path length to a transport container. In another embodiment a suite of sensors are used to detect the attachment location of a commissionable transponder.

For example, changes in capacitance are detectable using certain QProx charge transfer capacitance sensors available from Quantum Research Group Ltd. of Hamble, England. Ultrasonic range sensors are available from supplier such as muRata Manufacturing Co., Ltd. of Kyoto Japan under the trade name Piezotite. Optical path length sensors are available from Keyence Corporation of Osaka, Japan. Sharp manufactures a compact distance-measuring sensor GP2D02 that is responsive in the range from 5 to 100 cm. Thus, when a predetermined set of conditions is realized, the sensor triggers, enables, or selects a desired action. In one embodiment, proximity or contact of sensor suite with the targeted transport container causes a second type of Trigger Event, resulting in the commissioning and dispensing of a transponder by an encoder.

In other embodiments, sensor **218** is designed to determine the distance an encoder resides from an object that is to be tagged. Range information is acquired and processed in real time to determine if the encoder is in Close Proximity, Near, or Far from a transport container. In certain embodiments a controller is programmed to alter threshold distances between each range category and to associate a function with each range. In certain embodiments, range category Close Proximity is associated with transponder programming and application functions. For example, the range category Near is

reserved for transponder verification and/or reading functions; and Far is reserved for bar code scanning functions to verify that bar code information aligns properly with RFID transponder data.

In other embodiments a sensor suite is responsive to certain colors or patterns and uses that information to instruct the placement or detect the correct locations for applying good transponders and separate locations for discharging bad transponders.

FIG. **20** also shows how transponders **178** are rolled onto reels in preparation for encoding. Source roll **185** contains a supply of transponders ready for encoding. Release liner **182** conveys transponders **178** around peel device **183**. Unless transponders **178** are mechanically prevented from rotating around peel device **183**, they are conveyed onto take-up roll **184**. Take-up reel **184** advances forward while source roll **185** lags behind due to drag created by a clutch, brake, motor or other back-torque generating device. Opposing torques of take-up reel **184** and source reel **185** result in tension in release liner web **182**. Shape memory in face stock **181**A preferably prevents transponder **178** from remaining adhered to release liner **182** as it passes over peel device **183**, resulting in the leading edge lifting off and separating from webbing **182**. If take-up reel **184** continues to advance, and transponder **178** does not collide with another object, its attachment to release liner **182** on its trailing edge will result in that transponder being passed completely around peel device **183** onto take-up reel **184**. Full path rotation is preferably reserved for transponders that fail to properly encode desired information; and is therefore intended to be a reject process for failed transponders. Preferred embodiments result in tension created in web **182** in a process of tensile extraction of transponders from a source reel and selective transfer of good transponders onto an object or a person's finger. Mobile encoder **30** depends on a person's finger to prevent transponders **178** from rotating around peel device **183**. Mobile encoder **220** depends on a target object such as carton face **228** to prevent transponder **223**B from rotating around peel plate **222**B on a path toward take-up reel **221**J.

When the conveyance of RFID transponders results in the positioning of a transponder relative to a near field coupler within a signal null, the transponder and transport webbing are preferably nudged forward or backward to improve the signal coupling. This is preferably accomplished by momentarily activating the motor and transponder transport means **175**C.

Mobile Encoder

FIG. **17** shows a system **170** according to one embodiment of the present invention including a mobile encoder **175**. FIG. **5** shows a preferred embodiment for a mobile encoder. Mobile encoder **30** is comprised of housing **32**, belt clip **34**, antenna **36**, on/off switch **33**, system ready LED **37**, data ready LED **38**, and transponder ready LED **39**. It is further comprised of auxiliary switch **40**, and charger plug **41**. A cartridge or other pre-packaged self-contained supply of transponders **42** is preferably latched, snapped, clicked, popped, inserted, slid, or releasably mounted to the body of housing **32**. The cartridge preferably includes a take-up reel **44** for non-dispensed RFID transponders, and a port through which blank or securely encodable transponders emerge from source reel **43**. The source reel is preferably comprised of a core which may be made from plastic or a recyclable kraft paper fiber to form a wound tube. A tube extends from the walls of cartridge **42** to form an axle around which release liner and transponders are wound and subsequently unwound.

In certain preferred embodiments source reel or roll **43** is constructed using materials such as non-petroleum-based plastics, laminated paper layers, and materials primarily comprised of natural fibers. In another preferred embodiment the entire pre-packaged self-contained supply of unused transponders is transported to mobile encoder **175**, loaded into it, consumed, and disposed of preferably without generating landfill waste.

A key aspect of this invention is a complete pre-packaged, pre-assembled, pre-threaded, self-contained supply of encodable transponders, preferably unlocked with cryptographic access methods. The supply is preferably configured for efficient transportation and shipping, conveyance to a work site, and easy loading into mobile encoder **175**, preferably in a single fluid motion.

FIG. **21** is a preferred embodiment of system **170** wherein printed symbols are optically scanned by internal optical reader **226**. The embodiment shown in FIG. **21** uses a preferred method of sensing the linear motion of mobile encoder **220** across a target surface by using an optical mouse sensor **225**. Such devices are commonly used to track the hand movements of the operator of a computer. Motion in either the X or Y direction is translated into numerical displacement representations which when timed are converted into linear velocities. Tracking and processing the primary axis of motion parallel to the major axis of the release liner, the web speed is preferably controlled by processing means **1756** and transponder transport means **175**C such that transponder **223**A advances at a rate of speed that matches the velocity of the entire mobile encoder across the target surface. Optical mouse **225** tracks displacement across the target surface and also acts as a tamp head to strengthen the adhesive bond of each freshly applied tag. The process of attachment of the encoded transponder to the target surface is along a vector that is nearly parallel to the target surface at a speed that is based on real time feedback from the surrounding environment as sensed by the optical mouse or other sensor. Optical mouse sensor **225** preferably illuminates its target surface with either a LED (Light Emitting Diode) or a laser. Avago Technologies of San Jose, Calif. manufactures a variety of mouse sensors, both LED-based and laser-based. Laser illumination provides smooth and accurate motion sensing across a variety of surfaces. The model ADNS-6150 small form factor lens working in conjunction with the ADNS-6530 integrated chip-onboard laser sensor and single-mode vertical-cavity surface emitting laser can be used to not only detect motion in the X and Y directions, but also to some degree in the Z direction. Displacement along the Z (depth) vector is reported by the decrease in the number of resolvable features within the field of view as the target surface fades away from the optical focal point. That measurement is reported in the surface quality (SQUAL) register.

Optical mouse sensor **224**B is used to measure the linear velocity of transponders as they move along the path of the release liner toward peel device **222**B, as well as sense the gaps and edges between transponders **223**A and those adjacent to them. The physical outline **178** of transponders **223**A are a reliable indication of the location of RFID inlay **181**C located within each transponder **223**A and enhance system performance with reliable positioning relative to near field coupler **224**A2. The angular velocity of motor **227**B and gear train **227**A are controlled to achieve a linear transponder velocity that matches the velocity of the mobile encoder itself as it moves across the target surface. Therefore an operator with a fast hand motion is just as successful as a person with a slower hand motion, both will result in a transponder that lays flat, co-planar with the target surface, void of kinks or wrinkles that are characteristic of a poorly controlled transponder application process. In either case, transponder dis-

pensing by transponder transport means **175**C will not initiate until optical mouse sensor **225** preferably illuminates the target surface and detects a minimum number of valid features as reported by the SQUAL register internal to the ADNS-6530.

RFID Interrogator **224**A encodes RF transponders using either LF (Low Frequency), HF (High Frequency), UHF (Ultra High Frequency), or microwave radio energy. Transponders may be powered by radio energy, light, or stored energy from a source such as a battery. RF coupling is preferably through a near field coupler, an inductive loop or other suitable transducer **224A2** connected to interrogator **224**A to focus RF energy on a small area within mobile encoder **175**, **30**, or **220**.

Certain preferred mobile encoder embodiments will not encode RF transponders that fail authenticity tests. In a like manner, RF transponders will preferably not allow themselves to be programmed unless the interrogator can successfully unlock its secured memory banks. This is a preferred method of protecting transponder cartridge and mobile encoder supply chains from counterfeits and knock-offs. Mobile encoder **175** and the transponders loaded into it will only be successful in exchanging certain data if certain data encryption and challenge response protocols are adhered to. In a preferred embodiment each authorized RFID transponder converter company uses one or more encryption keys to generate passwords that lock the RF tags, whereby preventing them from being programmed unless they are unlocked using the same password. Passwords of this type are specified in the EPC Gen 2 specification and in ISO standards. The passwords are preferably generated by processing means **175**B using a public key from publicly readable data such as an asset number or a transponder serial number. A shared private key is then used by an encryption algorithm such as AES in order to create a password or a collection of passwords that can be used to lock or unlock one or several RF tags. Other methods may be used that provide a high degree of certainty that the both the transponders and the mobile encoders are from legitimate sources. Individual failures or patterns of authentication failures are preferably reported to a central database through wireless communications means **175**A for subsequent fraud investigation.

Peel device **222**B is part of the mobile encoder and preferably rotates or pivots about pivot point **222**A into position **222**C and a corresponding position (not shown) in FIG. **21**. Peg **221**K helps guide the web to peel device **222**B. When cartridge **221** is inserted into applicator body **227**F the web is held in a non-interfering position by guide post **221**F and its accompanying cartridge guide post such that peel device **222**C can self-thread around the transport web without human effort. This is an improvement over prior art where a peel device is an integral part of the pre-packaged self-contained supply of transponders and requires threading during the cartridge manufacturing process.

Peel device **222**B preferably contains a shield on the outer face of the blade, through which radio energy will not pass to encode or interact with a rejected transponder **223**B. The dielectric material of the peel device **222**B provides sufficient separation from a transponder within the encoding zone and the shield on the back side of the peel device. This is another advantage over a peel device that is part of the cartridge, where the cost sensitivity is much more acute. The shielding on the back side of peel device **222**B may be any suitable metal attached or adhered in any reliable or economical manner against the non-conductive dielectric structure of the peel device.



Rejecting transponder **223**B requires that mobile encoder transponder peel device **222**B have sufficient clearance from target surface **228** as determined by optical mouse sensor **225** using either the SQUAL reading or the shutter readings. Such readings are used to determine if there is sufficient space to advance and rotate a bad transponder **223**B around the distal end of peel device **222**B.

FIG. **1** shows a system **10** according to one embodiment of the present invention including a mobile encoder **30**. And, FIG. **5** details one possible mobile encoder **30**. In this embodiment, the encoder can attach to the belt of an operator, accordingly, mounted on the housing **32** is a belt mounting means such as belt-clip **34**, which easily adjusts for left-handed or right-handed operation and corresponding mounting on the belt (not shown) of the operator. An external antenna **36** enhances wireless connectivity to a host or network computer (not shown in this view), or to a remote-mounted computer device such as a PDA or bar code reader. Several operator indicator lights **227**E including a system-ready LED **37**, data-ready LED **38**, and tag-ready LED **39** mounted on the housing enabling the operator an easy view of the device status.

Also included on the exterior of the housing are an external, power-cord receptacle **41** so that the on-board lithium-ion, nickel metal hydride, or other appropriate battery **227**D may be charged as required. A combination on/off-next switch **33** enables the operator to selectively power up the encoder. A reset port, such as a recessed reset button (not shown in this view), enables an operator to reset the software settings of the device circuitry on control board **227**C as may be required.

A cartridge **42** containing a plurality of RFID transponders releasably mounts to a face of the housing **32**. The cartridge further includes a take-up reel **44** for non-dispensed RFID transponders, a port **46** (above take-up reel **44** but not shown in FIG. **5**) for dispensing commissioned transponders, and a supply reel **43** for holding blank RFID transponders prior to commissioning.

In further embodiments, a cartridge **221** containing a plurality of RFID transponders releasably mounts to the body of housing **227**F. The cartridge further includes a take-up reel **221**J for collecting release liner and non-dispensed RFID transponders, and a port through which blank or securely encodable transponders emerge from source reel **221**E. The source reel is comprised of core **221**A which may be made from plastic or a recyclable kraft paper fiber to form a wound tube. A tube extends from the walls of cartridge **221** to form axle **221**B around which core **221**A rotates. Brake shoes **221**C create drag, resulting in back torque on the source core, the magnitude of which is controlled by screw **221**D which with a knob (not shown) is used to adjust the force applied by brake shoes **221**C. The back torque for cartridge **221** is alternatively developed through a motor or an expandable friction coupling into a brake mechanism attached to encoder body **227**F.

Take-up core **221**H is driven by a tight coupling with drive hub **221**G. This tight coupling is achieved through a combination or selection of tight fit, expandable coupling, and sharp teeth. The result is a hub that will easily slide in or out of core **221**H with little effort, but still be capable of delivering a substantial amount of drive torque through that connection without slippage. Drive torque is delivered from gear motor **227**B to hub **221**G through drive gear **227**A the teeth of which engage with each other as cartridge **221** is set into position and locked into place.

In a preferred embodiment, mobile encoder **30** cryptographically unlocks, encodes, and verifies each transponder one by one. In preferred embodiments, transponders are verified more than once. One time immediately after program-

ming with a desired data payload, and then again a second time after encoder **220** automatically dispenses an RFID transponder **223**A onto target surface **228**. This second verification step insures that the properties of target surface **228** or other nearby materials do not adversely affect the performance of transponder **223**A.

In another preferred embodiment, encoder **220** is used to encode and dispense a pattern of several transponders **223**A onto a target surface **228** at regular intervals in order to map the surface of a container for example in order to determine an optimal location for a placement of transponders. This information is then preferably used for engineering and planning purposes for high-volume transponder application in a production or distribution facility. Transponders may be designed for operation in any or all of the UHF, HF, LF, or microwave frequency bands.

In one alternative embodiment, the mobile encoder **64** includes a handle (as FIG. **9** shows, for example) for hand operation of the encoder. In another contemplated embodiment, the mobile encoder is fixed to an assembly line in a stationary manner. Accordingly, the stationary-mounted encoder further includes machine-controlled devices for extracting a commissioned RFID transponder from the encoder and places the transponder on the container of interest by means well understood in the art.

In the aforementioned embodiments of the mobile encoder **30** (or hand-held encoder **64** of FIG. **8** or FIG. **9**, for example) key features commonly shared include means for enable Gent EPC or ISO standards compliance and multiple printer-emulation modes. On-board power source **60**, such as a rechargeable lithium-ion, Nickel Metal Hydride, or other battery enables freedom of movement as does means for wireless connectivity to a data network, such as the 802.11 wireless LAN (Wi-Fi), Bluetooth, or other standards-based communications protocol. However, a conventional power source that requires connectivity to a power-grid and a cable-based data network connectivity link would work under certain circumstances.

Further, in contemplated embodiments, the fixed or mobile encoder enables selective mounting to a magazine or cartridge filled with un-commissioned RFID transponders, which facilitates rapid and easy loading of the encoder with ready-to-use RFID transponders and further enables re-use, re-commissioning, and recycling of un-dispensed transponders and the associated cartridge. The mobile encoder can be monitored and controlled by virtually any handheld or mobile device, a host computer in a central location, or over the Internet.

Certain features and methods described and explained with relation to handheld applicators are also relevant to non-mobile RFID tag applicators that use a magazine, cartridge, reel, or roll to handle, transport, and dispense RFID tags, inlays, transponders, or wireless sensors. Magazines, cartridges, reels, and rolls are preferably capable of carrying either new or used tags and are preferably capable of being used in either mobile or non-mobile applicators. Magazines, cartridges, and reels are preferably refilled and reused. Magazines and cartridges preferably protect RFID tags from ESD.

Cartridges preferably indicate their empty/full status with a visible indicator such as: an LED, an LCD, a mechanical flag, a window with a view into the source reel, or other such indicators that help an operator choose which cartridge from which to next consume tags.

The mobile encoder **30** is activated (turned on) when an operator selectively depresses the combination on/off-next switch **33**. However, depressing the on/off-next switch for about three seconds or longer results in a sleep-mode cycle that can be interrupted by re-pressing the on/off-next switch. In sleep mode the operator indicators (LEDS **37**, **38**, and **39**) will turn off. If active, the mobile encoder system-ready LED **37** illuminates and connects to the assigned network. Network connectivity results in the illumination of both the system-ready LED **37** and the data-ready LED **38**.

Mobile encoders **175** and **30** optionally receive commands and data via the wireless link from the remote computer **154** or optical reader **173**. Special bar code commands are scanned by optical reader **173**, passed through wireless communication means **175**A, and interpreted by processing means **1756** mobile encoder **175** to perform certain pre-programmed functions. Commands originating from either computer **154**, optical reader **173**, or internal bar code scanner **226** (also designated in FIG. **1** as internal optical reader **175**F) perform functions in categories that include power management, data management, wireless configuration, security, configuration options, and utilization of internal resources.

The encoder receives commands and data via the wireless link from the remote computer **20** or host network computer **11** (of FIG. **1**). The data represents information to be encoded on an RFID transponder. The information is stored in the encoder's on-board memory and the tag-ready LED **39** or **175**K rapidly blinks green (cycles on/off to pulsate). An RFID transponder is moved from within the cartridge **42** to a position on the top edge of the cartridge for encoding in the encoder and the transponder is encoded with the appropriate information. The transponder is tested and if it is good—contains the data and encoding was successful—all three indicator LEDs indicate a solid-green color. The operator removes the encoded RFID transponder from the encoder and places it on the container of interest.

In the event that the encoding process failed, the bad transponder is detected and retained by the encoder, where it remains on the take up reel **44** inside the cartridge **42**. The take up reel also collects the release liner as the encoder **30** dispenses good transponders (properly encoded RFID transponders). The take up reel returns to a re-cycling center where components are re-used or recycled as necessitated. Further, the re-cycling center can perform failure analysis on returned transponders.

FIG. **7** is a schematic diagram of additional electro-mechanical components **70** (as generally referred to in FIG. **6**) and logic components of a possible encoder **30**. An RFID Module **63**, such as a MP9311 UHF reader module available from Sirit Technologies, 1321 Valwood Parkway, Suite 620, Carrollton, Tex., 75006, USA, communicates with a vertical polarized YAGI antenna **62** with a downward side lobe to low-power program (commission) RFID transponders to create an RFID transponder, and the same downward side lobe and verify transponders at low power also can read far-field transponders at a higher, second power. Additional components include a mechanical paddle trigger **86** for operator-selected override of the reel of RFID transponder stored in the supply or source reel **43** in the cartridge **42**. A drive motor **76** coupled to a dual output shaft gearbox drives the source transponder reel **43** via an intermediate take-up reel gear interface **78** at the cartridge mouth. Another gear assembly along with a spring couple **85** advances and positions the tag feeder paddle **84** with feedback from paddle position sensor **88**. A tag sensor **74** detects the location of the RFID transponder to-be commissioned by the YAGI antenna **62**. As the reel of RFID transponder advances inside the encoder, the lead edge passes the ratchet post **82**. If the now-commissioned transponder is read by the antenna **62** as "good", a ratcheting-back torque spring **83** enables a peel device, such as the shield and tag peel edge **73**, to engage, forcing the commissioned tag

to peel away from the carrier layer, which continues on to the take up reel **44**. In the event of a "bad" tag—that is, the antenna **62** reads the RFID transponder and determines an error has occurred—the shield **73** does not engage, allowing the defective transponder to remain on the carrier layer and proceed to the take-up reel. Once the good transponder is removed from the encoder, the tag sensor **74** detects the condition and enables the encoder to stand-by for the next event. Transponders are read, written, and verified when an operator initiates an action such pulling a trigger **86**, pushing a button, or some other command sequence.

Certain protective enclosures, such as cartridges **42** or magazines, are part of a family of interchangeable magazines of similar size, shape, and functionality, which are capable of housing and dispensing certain types, styles, shapes, and sizes of new or used RFID transponders. Transponder sizes typically range from 4 mm-thick foam-backed transponders measuring 12 mm wide down to thin transponders that are 15 mm wide on 19 mm pitch.

In at least one embodiment, the magazine or cartridge **42** includes a unique and embedded, RFID transponder which enables automatic interrogation and tracking of cartridge **42**. In certain embodiments, to minimize interference, the cartridge-specific and unique RFID tag or RFID transponder operates in a frequency band that is different than the supply of RFID transponders contained within the protective enclosure. Alternatively, other embodiments selectively interrogate cartridge identification transponders that operate in the same band as transponders within the cartridge that are to be applied.

Certain encoders require replenishment of the battery or other internal, on-board power source **60**, such as a fuel cell, or other energy storage technology. Accordingly, in some embodiments, an encoder **30** (or encoder **64** or encoder **210** of FIGS. **8**, **9**, and **10**) further includes a remote, selectively coupling base unit. The base unit enables a replenishment of magazines or cartridges, provides replaceable power sources, recharges the on-board power source, serves as a communications gateway, and provides a user interface for programming and maintenance of the encoder. For example, spare transponder magazines/cartridges are retained in cartridge pockets where they are protected from damage. Cartridges indicate their empty/full status with a visible indicator such as: an LED, an LCD, a mechanical flag, a window with a view into the source reel, or other such indicators that help an operator choose which cartridge from which to next consume transponders. The encoder, also, is retained by a protective pocket to prevent damage and to make any required electrical or mechanical connections to the base unit. In some embodiments a base unit mounts to diverse operating locations including various models of fork lift trucks. In such applications, the base unit includes a variety of wired and wireless communications options to enable omni directional communication with the encoder, cartridges, a host computer, vehicle mount terminal, a fork truck computer, or other relevant computing devices. The base unit includes a power system that is suitable for the application, including power filtering and energy storage capabilities such as batteries or fuel cells.

As with all ESD-sensitive equipment, care must be taken to avoid a build-up of damaging electrostatic charges. Accordingly, in certain embodiments charge is removed using a variety of conduction methods including wiping, air, and humidity controls, or use of special materials that contain short conductive elements optionally arranged within a flexible elastic cord.

In some embodiments, the encoder adapts to use a particular type of RFID transponder. One type of suitable RFID transponder is model number AD-220 from Avery Dennison of Brea, Calif. or, alternatively, Raflatac model 300846 from Tampere, Finland, or a Spider transponder or FT-33 FAT tag from RSI ID Technologies of Chula Vista, Calif. Such a transponder is die cut and adhered to release liner. Additionally, wireless sensors are manufactured to specifications that are compatible with the specific encoder, including such specifications as core diameter, outer diameter, and web width. Alternatively, certain steps are required to prepare a standard roll of ALL-9338-02 tags for use in an automated encoder, including unrolling from a large roll (up to about 6-inches in core diameter) onto several smaller rolls having a smaller core diameter (of about 1-inch to about 2-inches in core diameter).

Encoder **30** communicates with a remote computer and includes options to physically, electrically, and communicatively integrate with a portable data terminal (PDT) or a mobile computing platform. Certain PDT's have a variety of wireless connections including PAN and WLAN. Certain PDT's include a bar code scanner comprising a laser, an imager, or other means. In other suitable PDT's an RFID interrogator and antenna are built-in, while certain others have a card slot manufactured to a standard such as PCMCIA, CompactFlash, or Secure Digital, into which interrogator/antenna is plugged into. An example of such a card is the MPR 5000 that plugs into a PCMCIA Type II slot and is available from WJ Communications of San Jose, Calif. The MPR 5000 is compatible with handheld computers such as the Hewlett Packard iPAQ5550 or other models that accommodate smaller card-form factors, enabling them to read and write EPCglobal or ISO 18000 compatible UHF RFID transponders.

Other events, information, and status—such as changes in transponder readiness, transponders remaining on the source roll, remaining charge in the battery, changes in range-status between certain predefined states such as Close, Near, and Far—are communicated to the associated PDT. Other possible information, including certain power management functions, commands, status, and data-to-be-encoded into each readied transponder, is provided to the PDT over a wireless connection. Such a configuration puts the encoder in the role of a peripheral device to the PDT **219**, with PDT **219** managing the primary user interface and most computation functions.

In some embodiments the encoder adapts to exchange information with a host device, including a PDT, in either a batch-mode or through a real time connection. Batch mode uses a periodically connected data transfer channel such as a wired connection. Certain wired connections include serial data, infrared, optical, Universal Serial Bus, a parallel port, or other physical data connection. Certain real-time connections include wireless data links including Personal Area Network (PAN), Wireless Local Area Network (WLAN), and Wide Area Network (WAN). Certain PAN connections include Bluetooth and Zigbee. Certain suitable WLAN connections include IEEE 802.11a, IEEE 802.11b, and IEEE 802.11g.

For certain encoder embodiments passwords are encoded into transponders or wireless sensors when they are commissioned. Passwords are safeguarded using cloaking, obfuscation, cryptographic techniques, secure and trusted channels, locked memory, and other methods that are commonly used to protect confidential information. Passwords are generated or retrieved from data encoded in an RFID transponder to generate an index into one or more databases that contain a one dimensional array of passwords, a two dimensional array of passwords, a multidimensional array of passwords, or an array of actual or pointers to algorithms used to generate

passwords from transponder data, for example. Alternatively, cryptographic algorithms are used to generate passwords from transponder data.

Although this disclosure makes specific reference to a mobile encoder, it is understood that the encoder can easily adapt and be readily configured to a fixed operating environment. For example, it can be mounted to a forklift truck or a high-speed conveyer line and maintain advantages of wireless communication, rapid change-over and other qualities as discussed and developed more fully in this disclosure.

Interrogator Apparatus

Working as a stand-alone device, or combined with an encoder, certain embodiments of the present invention include an RFID transponder reader, also called an interrogator. The interrogator, in one embodiment, is a physically separate device that is solely in wireless communication with the encoder. In another embodiment the interrogator includes a wired connection to the encoder. In yet another embodiment, the interrogator connects to the encoder via an intermediate processor, such as a remote computer, or some other intermediate device. In yet another embodiment, the intermediate device is a shared processor in a physically integrated encoder/interrogator apparatus.

Regardless of the physical configuration of the interrogator, its function is to encode and/or verify a RFID transponder's (including wireless sensors) functionality. Certain embodiments use a mobile handheld reader to verify transponder functionality after carton attachment. Certain handheld readers also read bar codes that either partially or completely specify the data that is to be programmed into a transponder. Accordingly, an optical path from the interrogator to a location for reading bar code labels is used to identify certain information about the objects or containers that are to be tagged. Additional transponder encoding instructions and data is acquired through an integral network interface or a batch mode memory in the interrogator.

In certain embodiments, a shield structure incorporated in a combined interrogator/encoder prevents RF fields from interrogating or reprogramming RFID transponders yet-to-be-commissioned that are resident in the combined interrogator/encoder device.

In one embodiment, shown as a cross-sectional schematic in FIG. **8**, a contact image sensor (CIS) **90** or a linear optical array is used to scan along the length of an RFID transponder before it is applied to a container. CIS **90** produces a video stream that is decoded and then interpreted and stored by an on-board Computer **61**. CIS or a similar linear array sensor is capable of reading both linear and two-dimensional bar codes. In certain embodiments, CIS reads two-dimensional bar codes before attachment to inlay or transponder. The on-board computer creates a logical association between bar codes and the commissioned RFID transponder. Encoder **64** reads and associates all bar code symbols on a single segment with the RFID transponder or inlay adhered to it.

In FIG. **10** when an operator pulls the trigger **86**, which is either a mechanical trigger or an electro-mechanical device, the on-demand commissioning of the RFID transponder occurs and nearly simultaneously is pressed against a container within a fraction of a second. In certain embodiments, mechanisms internal to encoder **64** transfer mechanical force to the RFID transponder tag through the use of air, springs, motors, plungers, elastomers, or other energy storing or delivering methods. Reloading of the next tag (next transponder) and readying of the system are performed within a time interval that is acceptable to the operator and enables a high degree of productivity for tagging cartons, pallets, or other transport containers.

In certain embodiments of a combined interrogator/application, a trigger **86** couples to an electrical switch having one or more stable positions that are detectable by a controller. In certain modes of operation trigger-switch state is coupled with range information from a sensor suite **218** to execute functions at predetermined ranges at predetermined times. The result is a trigger that functions based upon detected range from a container or other object of interest. This advantageously improves operator efficiency and productivity as one trigger executes several different functions that are typically involved with RFID tagging including the tagging of bar-coded cartons that have been selected to receive wireless sensors.

Verification of bar code occurs either before or after an RFID transponder is commissioned and the tag applied to the container by merely stepping back to a point where the sweep angle of a laser beam or field of view of an imager can read a bar code label. In certain embodiments ranges shorter than that, but not in Close Proximity, are used for sweeping a radio frequency interrogation signal across the faces of multiple cartons to assure that the correct tags, the correct number of transponders, and the correct data within that transponders were all properly programmed.

In certain embodiments Close Proximity range is reserved exclusively for programming, applying, and verifying one transponder, all in a single pull of trigger. In other embodiments, the interrogator includes programmable conditions that enable Trigger Events to interact with external devices or nearby equipment. For example, at a predetermined range from the interrogator, activation of the trigger causes the encoder to transmit a coded signal to an external device as an indication of an operator action: at a Far-range the signal to requests an external device to read a bar code and the bar code information is decoded and transmitted back to encoder. In another embodiment, decoded barcode information is processed by a portable data terminal (PDT), a vehicle mount terminal, or other computing device.

The on-board computer **61** controls the operation of the RFID Interrogator Module **63** to read, write, and verify RFID tags, inlays, transponders, and wireless sensors that are applied or are within range of the interrogation fields produced by antenna **62**. The encoder **30**, capable of reading multiple RFID transponders near it, can, in certain embodiments, produce a linearly polarized radio field via the internal antenna **62**. In another embodiment, the internal antenna produces a horizontally polarized RF field. A commissioned transponder can be read both before and after it is applied to a transport container. When multiple transponders are within the interrogation field of the encoder **30** with an interrogator module **63** the on-board computer **61** determines which transponders are commissioned and dispensed versus those transponder that have not. In certain embodiments, the on-board computer maintains records of transponders recently applied in order to properly determine how to interact with each transponder in the field of the internal antenna or other antennae under the control of RFID Interrogator.

In one possible embodiment, the interrogator/encoder utilizes preprinted information on a set of RFID transponders. The pre-printed information includes one or more logos, an EPC-global Seal, and other informative alpha-numeric or bar-code data. Certain preferred embodiments of encoder/applicators **30**, **64**, and **210** correlate RFID tag data with data encoded in certain preferred bar codes. In certain preferred embodiments, applicators such as applicator **30** read the bar code preferably using a sensor such as CIS **90** as the tape is unrolled from a spool. In certain other preferred embodiments, an RFID tag is located on cartridge **42** and contains a

numerical value that is directly or indirectly representative of the numerical values optically encoded into the bar codes preferably at least indicating the starting numerical values of a number sequence. Other additional information is also encoded in the RFID tag in certain preferred embodiments, including the number of tag positions, the number of good tags, the ending sequence number, the date, time and place of tag conversion or other preferred commercial, logistic, or manufacturing information. In certain preferred embodiments of applicators **30**, or **210** certain wireless tags attached to cartridge **42** are capable of being read. In certain preferred embodiments the interrogator such as interrogator **63** is capable of reading an RFID tag mounted to the loaded cartridge, and is also preferably capable of filtering out its response to interrogation or programming of RFID tags.

Certain embodiments have a motorized tape drive and dispensing system. Certain embodiments contain some or all of the following: a rechargeable battery, an operator display, a wireless interface, a network stack, an IP address, a PCMCIA port, a Compact Flash port, a USB cable, a serial cable, a dock port, a window to allow the operator to view the transponder attachment process, or a bar code scanner.

One suitable interrogator includes model MP9311 available from Sirit Technologies of 1321 Valwood Parkway, Suite 620 Carrollton, Tex. 75006, USA. Other RFID transponder or wireless sensor interrogator modules with other feature sets are also possible for use in the interrogator/encoder.

FIGS. **8** and **9** show one possible interrogator/encoder **64** according to the present invention. The interrogator/encoder **64** comprises a housing **65** having a user input device **67**, such as a key pad or key board, and a user output device, such as an LCD screen **68**, for displaying optically scanned label data, RF interrogated data from a transponder, and other information including on-board diagnostic functions, bios status, and external information provided from a remote computer as sent over a wireless network, for example. A handle structure **66** enables point-of-use deployment while cartridge **42** enables on-demand commissioning of RFID transponders, which are dispensed from the transponder port **46**. In this embodiment, an integrated YAGI antenna **62** creates a large forward-looking main lobe of radio frequency energy for interrogation of commissioned RFID transponders. The internal antenna also produces side lobes of RF energy that although attenuated from the main lobe by several dB, couple enough power into nearby readied transponder to interrogate and write to it.

As further depicted in FIG. **10**, a reflector **219***b* passively reflects RF signals from an upper side lobe downward toward readied tag **216***f*. Backscatter from tag **216***f* propagates to both antenna **219***a* and reflector **219***b* for processing by the interrogator. Having such an antenna embedded in PDT **219** and mounted to the structure of the encoder housing enables the PDT **219** to encode and verify readied transponder **216***f* while commanding the encoder to commission and dispense a tag when a particular Trigger Event or a predetermined range status change occurs.

An antenna, or alternatively, leaky coax **212***a* or a near-field coupler is located outside of protective enclosure of cartridge **42** in a location very close to the tag attachment zone in front of a tamp head or tag application roller and holding rollers **216***d* or hammer **216***a*.

In some embodiments antenna **212***b* is a patch antenna with a radiation pattern toward the tag attachment zone. In other embodiments the antenna is a near field coupler. Alternatively, leaky coax, a type of coaxial cable having slits, slots, or perforations that allow radio frequencies to leak in or out, is used in encoders according to the present invention. A coupled-mode cable, which does not radiate as well as radiating-mode cable, is constructed with closely spaced slots in a corrugated outer conductor. Radiating-mode cable typically has a foil outer conductor with non-uniformly spaced slots arranged in a periodic pattern. Coupled-mode cable is a slow-wave structure. In free space its external fields are closely bound to the cable and do not radiate, except for minor end effects according to "Prediction of Indoor Wireless Coverage by Leaky Coaxial Cable Using Ray Tracing" by Samuel P. Morgan of Bell Laboratories, Lucent Technologies.

In certain embodiments an interrogator drives a signal into a leaky coax that is terminated in a purely resistive load of about 50 ohms. An RF-switch selects between radiating and non-radiating loads including an antenna or leaky coax and, therefore, avoids mismatched load impedance.

In other embodiments internal antenna **212***b* or **212***c* is a patch antenna with its strongest lobes oriented toward the tag holding and placement area in the region of holding rollers **216***d*. Antenna **212***c* or leaky coax **212***a* work with an interrogator to produce electromagnetic fields to interrogate, program, and verify wireless sensors. Shield **217***e* prevents interrogation or programming of RFID transponders until they arrive at separation roller or tag peel edge **217***d*. A reflector is used in certain embodiments to reflect RF radiation toward a readied transponder. In the event that verification fails, the operator is informed that the bad tag (or inoperable transponder) is to be discharged onto a surface of a third object other than the encoder or the transport container, for post-mortem analysis.

Referring to FIG. **10** drive motor **76** is preferably located inside the center of source reel **43** within the circular walls of applicator housing **211***b*, around which cartridge **42** is nested when mated to interrogator/encoder/applicator **210**.

Motor **76** is mounted to the structural frame of applicator **210** and preferably transfers mechanical power to certain drive points preferably using gears, belts, or drive shafts within applicator housing **201** a or **211***a*. In certain preferred embodiments of applicator **210** certain preferred drive points include take-up reel **44**, source reel **43**, or hammer arm **216***a*.

Trigger **86**, preferably embedded within trigger handle **66** is actuated by an operator, preferably causing a Trigger Event. In certain preferred embodiments, there is more than one kind of Trigger Event. In certain preferred embodiments of applicator **210** certain types of either mechanical or electromechanical actuators are preferably used to cause hammer mechanism **216***a* to trip, being driven toward readied tag **216***f*, through port **46** for placement on a transport container at the face of bulkhead **211***a*.

Another means of electromechanical actuation from a Trigger Event initiated by sensor suite **218** is illustrated in FIG. **10** whereby DC motor **215***c* runs in a reverse direction causing ratchet **216***b* to become disengaged, allowing hammer **216***a* to accelerate toward tag **216***f* due to the torque exerted by spring **216***c*. Hammer **216***a* passes between holding rollers **216***d* to press tag **216***f* against the face of a transport container.

Interrogator **212***d* is preferably capable of working with controller **213***b* to recognize which tags have been recently programmed or applied so as to filter out their response to interrogations of other tags, especially those tags that are being prepared for attachment. Interrogator **212***d* is preferably capable of modulating its transmitted radio power to affect the range and signal to noise ratio of its coupling to wireless tags.

Method of Using Smartphone for Encoding

FIG. **11** shows a method for using a smartphone for encoding RFID tags by using the built-in camera as a barcode

scanner. In step **111** a smartphone is positioned to capture the image of a barcode. The barcode can be 1D or 2D, it can carry GTIN or other information. It can already have a serial number such as a serialized Data Matrix barcode for a pharmaceutical item or container. In step **112** the image is decoded and processed by software. In step **113** the payload for a transponder is computed, preferably using serialization algorithms that are presently described. In step **114** a transponder is encoded with the transponder data payload. The transponder encoding apparatus is either built into the smartphone or attached to it as a peripheral device.

Referring to FIG. **22**, smartphone **154** is shown as an Apple iPhone with a peripheral encoding device attached to the accessory port. A peripheral device such as this is one embodiment, in other embodiments the components described herein are contained with the enclosure of smartphone **154**. Near field couplers **238***a* and **238***b* are used to couple magnetic fields with a nearby transponder for RFID transponder and wireless sensor authentication. Certain preferred embodiments use one coupler to transmit and the other to receive. Such embodiments therefore require close proximity of both couplers to a transponder in order to read or write transponder data, or to verify transponder authenticity. FIPS 140-2 module **239** has a cryptographic boundary that is preferably compliant with U.S. Government Federal Information Processing Standard 140-2 which is incorporated by reference herein. Module **239** detects temperature variations that are outside of upper and lower temperature limits which is one possible mode of cryptographic attack. It also has tamper detection that detect a physical breach of a mesh or other detection barrier. FIPS140-2 compliant cryptographic module **239** is used to hold cryptographic keys and to perform cryptographic functions. If the module detects an attack, the memory for storing cryptographic keys is immediately cleared. Module **239** preferably uses non-imprinting memory and therefore leaves no trace of the cryptographic information after being cleared.

Method of Tagging Containers

FIG. **12** is a block diagram representing a second method according to the present invention including applying RFID transponders to objects of interest. One suitable object of interest comprises transport containers such as corrugated cartons or shrink-wrapped cases on a shipping pallet, which is inadequately addressed by the prior-art, particularly for solutions for manually operated automatic encoding and attachment to a container.

Block **121** represents a process step including the identification and selection of a container to be tagged with an RFID transponder or wireless sensor. In one embodiment this step includes a manual selection and verification processes that consists of manual handling, visual sighting, and scanning bar codes with a hand-held optical reader device. This method contemplates that a transponder encoding scheme is ready in advance and synchronized with a pick list, customer purchase order, advanced shipping notice, and other such records to assure that goods are properly moved and accounted for. Preferred bar code scanners include those that allow an operator to freely handle cartons with two hands. Such scanners include laser bar code scanners or imagers that are worn on either that back of the operator's hand or near the top knuckle of a finger. Such scanners are described above, and preferably have a Bluetooth or similar wireless interface to connect to mobile encoder **175** or **30**. Bar code scanner **226** of FIG. **21** is a preferred embodiment of an alternative device that combines manual bar code scanning and RFID transponder encoding into a single handheld device. The operator may choose to scan bar codes that contain data, application identifiers, commands, or other elements commonly found in automatic data capture applications.

Block **122** represents the process step of processing bar code information to derive the underlying data. Depending on the type of bar code, how it is encoded, and its purpose, different processing steps will be used. In preferred embodiments the bar code may contain SKU information, a GTIN, an SGTIN, EPC data structures, a military UID, an SSSC, an asset number, a file identifier, or other such identifying information. In certain preferred embodiments, the bar code (either one or two dimensional) contains a partial or complete description of the data that is to be encoded into the RF transponder. Such bar codes are described in ISO/IEC draft document PDTR 24729-1. Application identifiers 01 and 21 are combined with additional encoded printed information to fully specify a serialized GTIN (or SGTIN). Using such bar codes does not require the use of additional data in order to generate RF transponder payload data. Mobile encoder **175** may therefore independently receive and process the RF transponder payload information. One type of bar code is used to signal mobile encoder **175**, **30**, or **220** that it should enter a mode whereby it performs a serialization algorithm without using an AI 21 bar code. This process step of identifying the information to be encoded may be included in the step represented by Block **121**. In this step (Block **122**), an operator may use a bar code reader or an encoder/interrogator of this disclosure. Alternatively, the operator may receive instructions delivered to a hand-held PDT or other mobile data terminal connected to a wireless network. This information is delivered to an encoder, such as encoder **30**.

Block **123** represents another process step whereby, using a mobile encoder, the operator then commissions an RFID transponder with the information of the previous step (Block **122**). Optionally, successful commissioning of the RFID transponder is verified by the encoder. In one embodiment, the encoder tests the next transponder and determines if it is operating within certain predefined specifications including parameters such as activation energy, backscatter signal strength, sensor performance, and other indications of the quality of the transponder. If the encoder determines that the transponder is not likely to result in a successful transponder deployment as may be determined by failure on multiple encoding and verification attempts or due to either physical or electronic deficiencies or abnormalities, then the operator is informed and the failed or bad transponder is discarded automatically or when an operator pulls a trigger under an operator-acknowledged transponder failure condition.

This step (Block **123**) also includes processes to read or determine by dead reckoning the information encoded into certain preprinted optically encoded symbols on the outward facing non-adhesive surface of the adhesive tape. In certain embodiments the adhesive tape is printed with information. In other embodiments the printed information is a machine-readable symbol such as a bar-code symbol. For example, one or more machine-readable symbols are read when the tape is prepared for use in an automated encoder or, alternatively, during the inlay conversion process and conveyed to an encoder through other data storage means, such as an RFID transponder. In one embodiment, an information encoding method uses either one-dimensional or two-dimensional bar codes. In some embodiments a linear imager is used to read either linear or two-dimensional bar codes as the tape is being unrolled from a spool. Some encoding schemes preprint machine-readable symbols at regular intervals along the length of a roll of adhesive tape. In certain embodiments the spacing of the preprinted symbols is at an interval of one half of the nominal length of each section of adhesive tape. In

certain embodiments, the encoded information is used as a reference to one or more data storage locations. In other embodiments the data storage locations are accessible through a computer network. In some embodiments, the encoded information is a series of sequential numbers. Information relating to data stored in the RFID transponder is stored in data storage locations that are referenced by one or more of the preprinted symbols. In an alternative embodiment more than one type of machine-readable symbols can be read from the surface of a segment of tape. In certain embodiments, more than one machine-readable symbol is used as a reference to the same or closely related data records of information stored in the RFID transponder or inlay, and either can be successfully used to access stored data.

In some encoders used in this step (Block **123**) a Trigger Event occurs, which results in the verification that a particular commissioned RFID transponder has been tagged and associated with a specific container. This Trigger Event occurs, in certain embodiments, when an operator pulls a trigger on the encoder. In other embodiments the Trigger Event occurs when certain sensors detect preprogrammed conditions relating to the proximity of the encoder face to an object that is to be tagged.

Finally, (Block **124**) the operator applies the RFID transponder on the container and, thus, commissions the transponder. In certain embodiments, the location of the targeted placement of the RFID transponder or wireless sensor on the container is stored in a database, which is referenced or pointed to by information that is stored in the memory of the encoder. In one embodiment, the operator holds the encoder against the face of the container based on the tagging requirements for that particular container. The tagging requirements including the location and orientation of the RFID transponder to be placed is conveyed visually or aurally. For example, the operator receives visual information via a screen or display on the encoder. In certain embodiments, physical indicators are attached to the encoder and extend from its body in a direction and manner so as to assist the operator in the positioning of the transponder onto the carton. In other embodiments, transponders are applied to the interior of a carton, before it is sealed.

Method of Commissioning RFID Transponders Using a Mobile Applicator.

FIG. **13** is a block diagram showing a method according to the present invention for commissioning RFID transponders using an encoder, such as the encoder **30**, couples to a cartridge or protective enclosure containing a plurality of RFID transporters releaseably mounted on a transport sheet or roll. The encoder enables the roll of RFID transponders to advance one position (Block **131**), placing the Next Tag in a test **1** position. The Next Tag is tested (Block **133**) to ensure that it performs within predetermined parameters such as activation energy, backscatter signal strength, sensor performance, and other indications of the quality of the transponder. One possible method includes encoding a transponder using only a minimal amount of radio-frequency energy. Since transponder encoding requires more energy than reading a transponder, this low power test constitutes a basic test of both minimal activation energy and backscatter signal strength.

An RFID transponder that fails this test (Block **133**) results in a "Bad Tag" status and proceeds to the take-up reel of the encoder (Block **135**). Thus, any failed transponder remains captive in the cartridge and cannot be released from the encoder by an operator. Optionally, the operator is notified of the failed transponder so the operator can request a newly encoded transponder (Block **137**). However, in one embodiment, the notification step occurs automatically, and a newly encoded next transponder is generated without input from the operator.

Block **132** shows that a "good" transponder is positioned in the encoder for the encoding process. The RFID transponder that passes the test **1** position is commissioned with predetermined data based on the container to be tagged. Methods of obtaining, storing, encoding, and commissioning this information on the RFID transponder are discussed elsewhere in this disclosure.

The commissioned transponder undergoes a verification process (Block **134**) to determine if the intended information was successfully encoded on the RFID transponder. Certain embodiments combine the verification step with the encoding step to gain operational efficiencies. If this verification test results in a fail condition, the transponder remains in the encoder and ultimately winds on the take-up reel in the cartridge for subsequent post-mortem failure analysis.

Block **136** represents a pass condition. The encoder removes the commissioned RFID transponder from the transport web or release liner, enabling the operator to retrieve the transponder from the encoder and in Block **138** apply the transponder to the container. In an alternative embodiment for Block **138**, the operator or a fixture holds the encoder against a surface of the container and the encoder places the commissioned RFID transponder directly on the container without operator intervention.

FIG. **14** is a system diagram that illustrates a preferred serial number allocation system according to the present invention. Blocks of serial numbers are allocated to RFID printers and encoding devices such as RFID encoder **155** of FIG. **15** as described in more detail below. Each object class, represented in FIG. **14** as GTIN's, has its own separate serial numbering space. As described above, the entire object class serial number space is subdivided into sectors that are defined by a limited number of most significant bits of the serial number field. In the case of a GS1 SGTIN-96 key type, the serial number field is 38 bits long.

To show how this is accomplished in Serial Number Database **140**, a representative object class is managed by Table GTIN A **141** and is shown to have three serial number block sizes of lengths 10, 11, and 12 bits. Within table **141** are three rows, or tuples **141***a-c*. Each row or tuple contains two columns or attributes: a starting serial number and the amount of remaining space until the next serial number block. In preferred embodiments, the remaining space is expressed in units of blocks of the selected block size.

Now by way of a more detailed example, allocation of blocks of serial numbers of different sizes is shown as requests are encountered over a period of time. An initial request is made for serial number Block **0 144** for GTIN A that is 10-bits long. At that time then all of the rows of table **141** show the same starting number of 000000. When the initial request for a 10-bit block is granted for block **144**, the starting number for the next block of that size is increased to the end of the first 10-bit block and the remaining blocks is computed based on the following algorithm: the starting point for the 11-bit block **141***b* is adjusted to the next greatest unused number that contains all zeros in the bits that represent the next assignable block of that size. The same is done for 12-bit block **141***c* and so forth unless those blocks have already been assigned to an RFID encoder **155** using for example Block **1 145**, in which case they are not changed. The remaining counts values for each block will remain at zero for each block that is not bounded on the upper side by an assigned block of another size. If a serial number block is bounded, then the remaining count value is adjusted to accu-

rately describe the number of serial number blocks that can be assigned. If additional blocks of that size are subsequently required, then, space permitting, a new block starting number is assigned and the process continues until the entire serial numbering space is fully allocated.

In preferred embodiments, a request is made by smartphone **154** as shown in FIG. **15**. The smartphone preferably performs biometric authentication as shown in step **161** of FIG. **16**. In step **162**, using smartphone **154** devices such as camera **237** of FIG. **22** a biometric match for a face, iris, voice, or fingerprints breaks the retry loop with an authorization to continue to step **163**. In step **163** transponder encoding is enabled and smartphone **154** is authorized to request, as a lower database level, blocks of serial numbers for specific object classes, such as certain GTIN's. RFID printers and encoders **155** are preferably then readied for encoding. Biometric security enables brand owners to enforce security procedures within their own plants and at contract manufacturing locations all over the world.

Table GTIN B **142** and Table GTIN C **143** show that each GTIN is managed separately to provide unique serial number blocks such as Block **2 146**, possibly according to different rules. In fact since GTIN's are typically purchased and owned by brand owners, and database **140** may be used to manage serial number allocation for multiple brand owners, then the rules that are applied to the various GTIN object classes in FIG. **14** may be different. Retail brand owners may want linear serial number assignments within each block while a pharmaceutical brand owner may want to have randomly assigned serial numbers within each serial number block. In a preferred embodiment allocated block **141***c* is issued to a lower database level or directly to an encoder's internal memory for commissioning transponders with randomly assigned serial numbers from within the range of numbers that are defined by that allocate block **141***c*.

Brand owner A with GTIN A may also have serial number blocks managed with a finer granularity than brand owner C with GTIN C. Furthermore a possible reason for brand owner C to select very large block sizes as shown in Table GTIN C **143** is to allow serial number allocation to be managed according to a different method such as chip-based serialization from chip manufacturers Impinj, Alien, or NXP for example.

FIG. **15**, a block diagram, shows the essential parts of a system to manage unique serial numbers on a global scale using smartphones as mobile remote computers. Server **151** is a computer running a server application such as an Apache HTTP web server on an operating system such as Unix, FreeBSD, Linux, Solaris, Novell NetWare, Mac OS X, Microsoft Windows, OS/2, or TPF. Web server **151** can be owned, borrowed, or rented by the slice from cloud service providers.

SQL database **152** preferably conforms to ISO/IEC 9075 and its various parts. In other embodiments, a database other than SQL is used to perform the data storage and retrieval functions described herein. SQL queries are preferably performed with the declarative SELECT statement which retrieves data from one or more tables, or expressions.

Script **153** preferably executes on server **151** and is written in a general-purpose server-side scripting language such as PHP to produce dynamic web pages.

A segment of PHP code that is used to store RFID tag commissioning data is:

```
$stmt=$this->db->prepare("INSERT INTO SGTINs (CommissioningReport_EncStatus_SessionNum, SGTIN, GTIN) VALUES (?, ?, ?, ?)");
$stmt->bind_param("ssii", $attrSession, $sgtinN, $attrGtin);
$stmt->execute( );
$stmt->close( );
```

Smartphone **154** preferably uses asynchronous data transfer techniques in a multi-threaded computing environment to communicate with script **153** in server **151** to prevent thread-blocking that gives the appearance of the program seizing up while waiting for a database transaction to be completed. Certain preferred embodiments use ASIHTTPRequest on Apple iOS smartphones to request a transaction with a remote database without blocking a major program thread. Below is an example of an iOS function to store an XML commissioning report from RFID encoder **155**:

```
-(void)SQLStoreRecentTaggingForString:(NSString *)recentTagging
{
   NSURL *url = [NSURL
URLWithString:@"http://www.adasainc.com/update.php"];
   ASIFormDataRequest *request = [ASI Form Data Request
requestWithURL:url];
   NSString *comTagStrTrimPhp = [recentTagging
stringByReplacingOccurrencesOfString:@" " withString:@""];
   NSLog(@"SQLStoreRecentTaggingForString: '%@'",
   comTagStrTrimPhp);
   [request setPostValue:comTagStrTrimPhp forKey:@"comTags"];
   [request setDelegate:self];
   [request startAsynchronous];
}
```

The method startAsynchronous is used on the request to start a database transfer on a separate computing thread. This is one important aspect of asynchronous data transfer in periodically connected system nodes. Another example is in the collection of XML report data from RFID encoder **155**, piece by piece to assemble a complete string. The iOS code line [scanner.readRecentString appendString:trimStr]; illustrates how trimStr is appended onto a string, in this case named readRecentString that is an NSMutableString that is allocated as part of an instance that coordinates communications with a particular RFID encoder. Once the end tag is received, then iOS program assembles a request to store tag commissioning data. The iOS program is also ready to receive authorizations from server **151** as responses are returned from it. The authorizations are preferably able to be stored and retrieved when the same RFID encoder **155** reconnects with smartphone **154**. This system design therefore illustrates a preferred method for collecting commissioning data, storing it in an SQL database, and delivering new encoding authorizations to RFID encoders like RFID encoder **155** without requiring any real-time connections to a remote database.

RFID Transponder **156** receives and stores a globally unique identifier such as an SGTIN-96 through an intermittently connected chain of computers and programs as described above and as illustrated in FIG. **15**.

In FIG. **23**, Block **240** is used to scan a barcode, such as a GTIN. In Block **241** the RFID transponder payload is computed, preferably using serialization algorithms and methods that are disclosed herein.

Block **242** represents the process step whereby mobile encoder **175**, **30**, or **220** encodes an RFID transponder with the information of the previous step (Block **241**).

Successful commissioning of the RFID transponder is preferably verified by the encoder as shown in Block **243**. In one embodiment, the encoder tests the immediate transponder and determines if it is operating within certain predefined specifications including parameters such as activation energy,

backscatter signal strength, sensor performance, and other indications of the quality of the transponder.

If in Block **244** the encoder determines that the transponder is not likely to result in a successful transponder deployment as may be determined by failure on multiple encoding and verification attempts or due to other evidence of physical or electronic deficiencies or abnormalities, then the operator is optionally informed and the failed or bad transponder is discarded automatically as shown in Block **245**.

Block **246** is the process of using motor **227**B and/or transponder transport means **175**C to pull release liner **182** tighter and tighter such that webbing **182** advances forward to the point that the leading edge of transponder **178** extends past the distal end of peel device **183** or **222**B.

In Block **247** web **182** is pulled forward to the point that transponder **178** or **223**A begins to rotate around peel device **183** or **222**B. It is in this step that either a human finger or some target object needs to be presented in the rotational path of the tipping transponder **178** or **223**A must be located. In the case of mobile encoder **30** where the operator is required to handle the encoded tag, it is important that their finger be present as transponder **178** begins to tip, allowing adhesive layer **181**D of transponder **178** to make contact and be removed for placement on a target object such as a shipping container, trackable asset, automobile windshield, or other object of interest. In cases where the operator scans a bar code and applies encoded transponder **178** in a single motion, mobile encoder **220** is preferred, wherein as transponder **178** tips as it rotates around peel device **222**B adhesive layer **181**D sticks directly onto target surface **228**. In either case, encoded transponder **178** is caught mid-rotation and adhesive layer **181**D provides adhesive forces sufficient to completely detach transponder **178** from release liner **182**, thus completing the function of Block **247** where work flow returns to Block **240** for another transponder encoding cycle to begin.

While the invention has been particularly shown and described with reference to certain embodiments, it will be understood by those skilled in the art that various changes in form and detail may be made without departing from the spirit and scope of the invention.

I claim:

**1**. An RFID transponder comprising:

a substrate;

an antenna structure formed on the substrate; and

an RFID integrated circuit chip which is electrically coupled to the antenna structure,

wherein the RFID integrated circuit chip is encoded with a unique object number, the unique object number comprising an object class information space and a unique serial number space, and

wherein the unique serial number space has an allocated block stored therein defined by a limited number of most significant bits of the unique serial number space as designated by an external numbering authority.

**2**. The RFID transponder of claim **1**, wherein remaining bits of lesser significance of the unique serial number space are encoded with a unique serial number for the object class.

**3**. The RFID transponder of claim **1**, wherein the object class information space is encoded with information comprising a company prefix, an item reference, a partition value, and a filter value.

**4**. The RFID transponder of claim **1**, wherein the unique object number is a portion of a serialized global trade item number.

**5**. The RFID transponder of claim **4**, wherein the serialized global trade item number is an EPC SGTIN-96 encoding.

**6**. The RFID transponder of claim **1**, wherein the unique serial number space is at least 38 bits.

**7**. The RFID transponder of claim **1**, wherein the allocated block is defined by at least 3 most significant bits.

**8**. The RFID transponder of claim **1**, wherein the allocated block is assigned based at least in part on a block starting serial number and a block size number within the unique serial number space.

**9**. The RFID transponder of claim **1**, wherein the allocated block is one of a plurality of allocations intermittently received by an encoder from an external numbering authority.

**10**. The RFID transponder of claim **1**, wherein the RFID integrated circuit chip is comprised of silicon.

**11**. The RFID transponder of claim **1**, wherein the RFID integrated circuit chip is comprised of polymer.

**12**. The RFID transponder of claim **1**, wherein the substrate, antenna structure, and RFID integrated circuit chip are covered by a face stock material.

**13**. The RFID transponder of claim **1**, wherein the RFID integrated circuit chip is disposed on the substrate.

**14**. A RFID transponder comprising:

a substrate;

an antenna structure formed on the substrate; and

an RFID integrated circuit chip which is electrically coupled to the antenna structure,

wherein the RFID integrated circuit chip is encoded with a global trade item number including a unique object number, the unique object number comprising an object class information space including a block of at least 50 bits and a unique serial number space including a block of at least 38 bits, and

wherein the unique serial number space has at least one allocated block stored therein defined by at least 3 most significant bits of the unique serial number space as designated by an external numbering authority.

**15**. The RFID transponder of claim **14**, wherein remaining bits of lesser significance of the unique serial number space are encoded with a unique serial number for the object class.

**16**. An integrated circuit, comprising:

a radio frequency circuit configured to backscatter a return link signal for processing by an RFID interrogator;

control logic; and

a memory,

wherein the memory is configured with a unique object number space, the unique object number space comprising an object class information space and a unique serial number space, and

wherein the unique serial number space is encoded with an allocated block defined by a limited number of most significant bits of the unique serial number space as designated by an external numbering authority.

**17**. The integrated circuit of claim **16**, wherein remaining bits of lesser significance of the unique serial number space are encoded with a unique serial number for the object class.

**18**. The integrated circuit of claim **16**, wherein the object class information space is encoded with information comprising a company prefix, an item reference, a partition value, and a filter value.

**19**. The integrated circuit of claim **16**, wherein the unique object number is a portion of a serialized global trade item number.

**20**. The integrated circuit of claim **19**, wherein the serialized global trade item number is an EPC SGTIN-96 encoding.

* * * * *

# ALIEN® HIGGS™4 IC SERIALIZATION

## SIMPLIFYING ENTERPRISE WIDE UNIQUE NUMBERING

The Alien® Higgs™4 integrated circuit (ICs) supports a range of optional serialization schemes. These use unique numbers programmed into Higgs-4 by Alien at IC manufacturing time and result in minimizing serialization efforts across large enterprises.

## Problem

- Customers want relief from complex enterprise wide serialization challenges
- There is a need to have a common serialization scheme across multiple sites, converter machines and suppliers
- Implement this today, with current technology
- Brand-owners, who own serialization, could benefit from understanding the implementation options available to them

### Background:

The Electronic Product Code (EPC) is designed as a universal identifier that provides a unique identity for every physical object anywhere in the world, for all time (the product and the instance of that product). Its structure is defined in the EPCglobal Tag Data Standard (see http://www.gs1.org/gsmp/kc/epcglobal/tds). For the purpose of this paper, we simplify the EPC into two conceptual parts. The first identifies the product type or Stock Keeping Unit (SKU). The other portion is a serial number that defines a unique number for that product instance. More simply put, there is portion that is a number that represents the product (e.g. pair of blue socks, medium size) and a portion that is a serial number that tells us that this is the blue medium sock number 12,476,996 (the unique instance number).

Bar codes have the product SKU but not the serial number. So the EPC can be thought of as:




Figure 1 - GTIN and SGTIN

# Alien Higgs-4 IC Serialization

Simplifying Enterprise Level Unique Numbering

Terminology:

- The non-changing (product) identifier is known as the Global Trade Item Number (GTIN). This only identifies the product type or stock-keeping unit (SKU) rather than an individual instance of a particular product type.
- The serial number must be added to the GTIN to identify the specific instance of that product within the EPC. This is the Serialized Global Trade Item Number (SGTIN).

If there is only one manufacturer of blue/medium socks and only one brand owner of the socks, adding the serial number is a simple affair of starting at zero and incrementing the serial number for every pair of socks produced. However, the complications occur when (in any or all combinations of):

- There are more than one supplier of the product (the brand owner is using multiple product sources)
- Each supplier is using multiple machines in parallel to manufacture that one product
- Each supplier has distributed manufacturing in different regions or even different countries
- The supplier may even sub-contract manufacturing themselves to multiple suppliers
- The supplier may be supplying the same product to more than one brand owner

The problem is … how do you add a serial number, given any combination of real-world complexities described above…

- Without a single central database (since more than one organization is involved)
- Doing this efficiently
  - o Assigning 50 million serial numbers to each machine may be inefficient if some machines are used more than others
  - o Who assigns the serial number ranges? The brand owner may not be able to do this if the supplier is supplying the same product to more than one brand-owner.
- Without duplication of the serial number
  - o What happens when machine 72 malfunctions? What serial number was last used? Which of the last 160 products were correctly programmed (on which serial number do I restart the machine to avoid duplication and not waste serial numbers)?
  - o Two machines are started with the same or overlapping serial numbers. User error in entering a start number on one machine could result in hundreds of thousands of duplicates before the error is discovered.

These examples are not exhaustive, but meant to approximate some of the challenges involved.

The final challenge is that the serial portion of the SGTIN is only 38 bits (as defined by the EPCglobal Tag Data Standard). This provides a maximum of $2^{38}$ possible serial numbers (almost 275 billion). While this sounds a lot, if you are to start splitting this bit-range across a large supply chain, across multiple production lines, across multiple machines, the actual number of serial numbers useable becomes much smaller even with some complex central serial number management. Remember, that the specific supply chain, lines and machines may be different per product which can make serial management completely impractical or at least unwieldy (for example, what happens to the serial number scheme when a new supplier is added or a manufacturing line is removed?).

| Header | Filter | Partition | Company Prefix | Item Reference | Serial Number |
|---|---|---|---|---|---|
| **8 bits** | 3 bits | 3 bits | 20-40 bits | 24-4 bits | **38 bits** |
| **Non Changing Product SKU Portion (GTIN)** | | | | | **Serialized Portion** |
| **SGTIN** | | | | | |

Table 1 - EPC SGTIN-96 Format as Defined by the EPCglobal Tag Data Standard V1.6

## The Challenge:

There is agreement in the industry, coordinated through the EPCGlobal group within GS1 (http://www.gs1.org/epcglobal/) , that the "brand owner" owns the challenge of serialization.

The challenge is to provide a mechanism, as simple, efficient and as cost effective as possible, to allow brand-owners to add a serial number to the Electronic Product Code (EPC) of their products (creating SGTIN), without duplication.

## Options:

There are two sources for the serial number, either from another part of the RFID chip that already contains a unique serial number, or from a computer managing these serial numbers on behalf of the brand-owner (known as "IT Based Serialization"). There are pro's and con's for using each approach and the solution selected may have more to do with whether the brand-owner wants to define the scheme and manage the complexities themselves or whether the brand-owner wishes to push that responsibility elsewhere. The responsibility may be pushed to a converter/printer or to the chip manufacturer (and the converter/printer may choose to use some of the chip serialization in a hybrid approach).

For non-IT based serialization, the serial number can be created by a 3rd party, such as printer/converter, or by the chip vendor, in this case, Alien.

**Serial numbers may be sourced from:**

- *IT Sources – managing and creating the serial numbers under computer control by an algorithm owned (directly or indirectly) by the brand-owner*
- *The RFID chip using chip based serialization (Alien supplies pre-encoded chip-based serialization)*

*A third party Printer / Converter can often create and manage the labels on behalf of the brand owner. This third party may choose to manage the serial numbers themselves (IT source) or use chip-based serialization.*

## Chip-Based Serialization:

For Alien customers using Higgs-4 IC, there are two "chip-based" serialization schemes that can be used.

- Use a **pre-encoded** serial number **already** in the EPC (Higg-4 only)
  - o There is no need to keep a database to ensure serial numbers are unique since this is guaranteed by Alien at manufacturing time of the Higgs-4 IC.
  - o Alien has agreed with a number of other RFID IC manufacturers to use Multi-vendor Chips based Serialization (MCS). This is explained further below.
- Create a new serial number from an internal unique serial number that resides outside of the EPC memory
  - o Portions of a unique serial number (not yet present in the EPC fields), can be manually copied by the printer/converter to the EPC.
  - o The printer/converter will need to manage how this is accomplished. This paper described what needs to be done to create this.

## Pre-encoded Chip-Based Serialization:

The Higgs-4 IC provides an *optional*[1] solution to serialization that requires minimal overhead and removes the need for a brand-owner to manage a database of serial numbers. In order to understand the details we will first discuss the memory available in Higgs-4 IC (and for completeness we show Higgs-3 IC as well).

[1] Optional since it may be overwritten by the brand-owner if they do not wish to use pre-encoded chip-based serialization

# Alien Higgs-4 IC Serialization

Simplifying Enterprise Level Unique Numbering

Alien's Higgs-4 IC's contains two banks of memory that are relevant to the conversation.

- The EPC bank (shown green below), specifically the EPC# field within it (shown dark green), is where we would like to create an EPC number that contains the Serialized Global Trade Item Number (SGTIN). This is owned by the brand owner.
- The TID bank (light orange), specifically the UTID (Unique Tag ID – dark orange) which is a 64 bit pre-encoded serial number that is guaranteed by Alien to be unique. Other IC manufacturers may have a similar field or fields, sometimes smaller or scattered around multiple locations within their chip. So, Alien's serial number is unique compared to any other Alien chip but there may be a similar serial number from another chip vendor i.e. it is unique to Alien chips only.

| Bank | Description | Higgs-3 Bank Address | Higgs-3 # of Bits | Higgs-4 Bank Address | Higgs-4 # of Bits |
|---|---|---|---|---|---|
| **User** | User | 00h – 1FFh | 512 | 00h – 7Fh | 128 |
| **TID** | Device Configuration | 60h – BFh | 96 | 60h – BFh | 96 |
| | **Unique Tag ID Unalterable** | **20h – 5Fh** | **64** | **20h – 5Fh** | **64** |
| | TID EPC/TMD/TMDID/TMN | 00h – 1Fh | 32 | 00h – 1Fh | 32 |
| **EPC** | **EPC #** | **20h – 7Fh** | **96** | **20h – 9Fh** | **128** |
| | EPC-PC | 10h – 1Fh | 16 | 10h – 1Fh | 16 |
| | EPC-CRC | 00h – 0Fh | 16 | 00h – 0Fh | 16 |
| **Reserved** | RES-Access Pwd, EPC optional | 20h – 3Fh | 32 | 20h – 3Fh | 32 |
| | RES-Kill Pwd | 00h – 1Fh | 32 | 00h – 1Fh | 32 |

Table 2 - Higgs Family Memory Map

The concept is simple. The goal is to take the product SKU (more accurately the GTIN) and add a serial number (which is 38 bits by definition of the standard) to create the SGTIN (serialized GTIN) in the EPC. The GTIN is defined by the product and does not change from tag to tag (for the same product). If we have a unique number in the serial portion for all Alien tags (regardless of the GTIN) then the combination of GTIN plus this serial number is also unique. In reality, with $2^{38}$ bits, after 275 billion products, the numbers will restart and a duplicate will be created. However, it is unlikely this will happen in the lifetime of most products in the market today.

As Alien *already* has a unique serial number in the Higgs-4 IC (in the UTID), Alien is providing the EPC pre-encoded (pre-programmed) with the lower bits from the UTID serial number in the EPC (with one addition, see MCS below). During manufacturing time of the IC, the UTID serial number has the lower bits copied into the EPC. This means that the only thing the "customer" of the tag has to do is to copy the SKU (non-changing portion or GTIN) into the tag. To speed this up, Alien also provides a couple of additional Higgs-4 capabilities:

- *Blast***Write™** - Writes a constant bit pattern of any word length (such as the product SKU or GTIN) starting at any world aligned memory location (in this case the static EPC fields) to multiple-chips in one command. This allows the GTIN to be written to 50 or 100 tags in one command. Alien has tested BlastWrite writing at a rate equivalent to 3,600 tags per minute. This assumes that all writes are word-aligned.
- *Quick***Write™** - Writes a bit pattern of any word length starting at any world aligned memory location (to a single chip)

So, the Higgs-4 IC comes pre-encoded with the serial number and BlastWrite and QuickWrite are used to quickly set the non-changing part of the EPC speeding up and simplifying the serialization of tags and ICs. To simplify the discussion above, we conveniently simplified the serial number to a single field. The Higgs-4 IC actually has a two part serial number as defined by the Multi-vendor Chips based Serialization (MCS) schema.

## Using the Pre-Encoded Higgs-4 IC Multi-vendor Chips-based Serialization (MCS)

The description above purposely did not mention MCS which is included as part of the "serial portion" of the EPC when encoded by Alien. The serial number provided by Alien in the UTID is unique to Alien but not to other vendors. To further assist customers using chip-based serialization, several UHF RFID IC vendors, including Alien, have agreed to an approach that splits a small header that defines who the chip vendor is with the serial number described above. The header is 3 bits which leaves 35 bits for the serial portion. This modifies Table 1 to look as follows:

| Header | Filter | Partition | Company Prefix | Item Reference | Serial Number | |
|---|---|---|---|---|---|---|
| **8 bits** | 3 bits | 3 bits | 20-40 bits | 24-4 bits | **38 bits** | |
| **Non Changing Product SKU Portion (GTIN)** | | | | | **Serialized Portion** | |
| | | | | | 3 bit MCS Header | 35 bit serial (vendor specific) number |
| **SGTIN** | | | | | | |

Table 3 - EPC SGTIN-96 Format with MCS

The 38 bit MCS serial number (including the MCS header) allows brand-owners to source their chips from more than one passive UHF RFID vendor and use the same serialization scheme and have confidence that the serial number used will remain unique regardless of the IC source (as long as the source is an MCS compliant supplier). The MCS table that is used to look-up the supplier (as of May 2012) is defined as follows (new vendors may be added over time):

| Number Range | Usage |
|---|---|
| 000 (open) | Can be allocated to any number sources. Ranges can be merged or further sub-divided for chip or IT sources. (5/8 of total space) |
| 001 (open) | |
| 010 (open) | |
| 011 (open) | |
| 100 (open) | |
| 101 (Impinj) | 101 <followed by 35 serial bits from Impinj chip> |
| **110 (Alien)** | **110 <followed by 35 serial bits from Alien chip>** |
| 111 (NXP) | 111 < followed by 35 serial bits from NXP chip> |

Table 4- MCS Look-up Table to that Defines the 3-bit Header

As of the time of writing this whitepaper, only Alien is **pre-encoding** the MCS header and serial number in to chips (Higgs-4 IC only). Some vendors do not create the EPC serialization at manufacturing time and leave the creation of the MCS header and serial number to the printer/converter. Use of the MCS compliant serial number provided by Alien is optional. If the brand-owner wishes to use a different scheme, they can simply overwrite the EPC serial number with something different.

So in summary, the MCS compliant serial number creation looks like this:




**Figure 2- MCS Compliant Serialization Pre-Encoded into Higgs-4**

## Creating a Custom (Non-Pre-Encoded) Chip Based Serial Number in the EPC

Some vendors or brand-owners may wish to create their own (EPC based SGTIN) serial number scheme (not use MCS) but still use the fact that Alien chips are provided with a unique serial number in the UTID. An example may be that the brand-owner prefers a 32 bit serial number as this makes writing to tags more efficient. The following describes which bits need to be extracted from the UTID and placed into the EPC# field of the EPC bank to achieve this.

In Higgs-4, all that is necessary is to pull out an existing serial number from the low 32 to 38 bits from the UTID (Unique tag ID, part of bank 2, which is called the TID bank) and write these into the low-order bits of the EPC. The UTID words are words 2, 3, 4 and 5, starting with word zero at the beginning of the bank. The user should reserve some bits in the serial number to allow for different tag manufacturers. Using more bits will allow more time until the serialization scheme rolls over, even 32 bits will be unique for years.

The creation of a custom chip-based serial number looks like this:




Figure 3 - Creation of a Custom Serial Number in Higgs-4

## Conclusion

Alien provides a suite of options for tag serialization for enterprise wide tag management:

- An optional **pre-encoded** Multi-Chip vendor Serialization (MCS) schema for the Higgs-4 IC;
- The capability for a converter/printer to create a custom serialization scheme but leveraging from the unique UTID serial number in the Alien Higgs-4 IC, or
- To create a separate IT based serialization scheme

Alien Technology
18220 Butterfield Blvd.
Morgan Hill, CA 95037
866-RFID NOW
www.alientechnology.com

Copyright© 2012 Alien Technology Corporation. All rights reserved.

Alien, Alien Technology, the Alien Technology logo, FSA, Higgs, BlastWrite, QuickWrite, Dynamic Authentication, Squiggle, and the Squiggle logo are trademarks or registered trademarks of Alien Technology Corporation in the U.S. and other countries.

DISCLAIMER Application recommendations are guidelines only - actual results may vary and should be confirmed. This is a general purpose product not designed or intended for any specific application.

This product is covered by one or more of the following U.S. patents: 7967204, 7931063, 7868766, 7737825, 7716208, 7716160, 7688206, 7671720, 7659822, 7619531, 7615479, 7598867, 7580378, 7576656, 7562083, 7561221, 7559486, 7559131, 7554451, 7551141, 7542301, 7542008, 7522055, 7500610, 7489248, 7453705, 7452748, 7425467, 7417306, 7411503, 7385284, 7377445, 7364084, 7353598, 7342490, 7324061, 7321159, 7301458, 7295114, 7288432, 7265675, 7262686, 7193504, 7173528, 7172910, 7172789, 7141176, 7113250, 7101502, 7080444, 7070851, 7068224, 7046328, 6998644, 6988667, 6985361, 6980184, 6970219, 6952157, 6942155, 6933848. Other patents pending.